[No. 11407.   Department One.   April 29, 1914.]

MARGARET ST. MARTIN *et al.*, *by their Guardian, etc.,*
*Respondents,* v. SKAMANIA BOOM COMPANY,
*Appellant.*[1]

APPEAL—OBJECTIONS BELOW—NECESSITY. An objection that evidence of a marriage was not the best evidence cannot be urged on appeal when it was not made below.

MARRIAGE—EVIDENCE—SUFFICIENCY. Where a marriage was only a collateral issue, evidence that a witness' father and mother were living together as man and wife is sufficient to prove the fact of marriage, in the absence of objection that it was not the best evidence.

EVIDENCE—WEIGHT AND SUFFICIENCY—PHENOMENA. Where all the evidence was to the effect that a hot spring rises and falls with the rise and fall of a river, and that the water in the spring is hotter when the flow is greater, the court is bound to take the evidence without speculation as to the causes of the phenomena, there being no evidence to the contrary.

WATERS AND WATER COURSES—OBSTRUCTION—DAMS—PRESCRIPTIVE RIGHTS. A prescriptive right to dam and impound the waters of a river cannot be claimed where the operations did not cause any injury to a riparian owner until less than ten years before the commencement of the action; since a prescriptive right to an easement to use or damage lands of another begins to run from the time the cause of action first accrues.

SAME—DAMS — PRESCRIPTIVE RIGHTS — ADVERSE USE — CLAIM OF RIGHT—PERMISSIVE USE—EVIDENCE—SUFFICIENCY. Where, upon objection to defendants' dam impounding the waters of a river, which injuriously affected the flow of a spring upon plaintiff's land, the defendant agreed to and did release sufficient water to supply the spring, and negotiations were had from time to time looking to an avoidance of the injury, there was no such acquiescence in the defendant's use of its dam in such a way as to injure the spring as to make the use adverse or under an unqualified claim of right; hence a prescriptive right to so use the waters would not be acquired.

SAME—PRESCRIPTIVE RIGHTS—BURDEN OF PROOF. The burden is upon one claiming a prescriptive right to dam a stream to prove an adverse, hostile, continuous and uninterrupted use under a claim of right, for a period of ten years.

[1]Reported in 140 Pac. 355.

LOGS AND LOGGING—BOOM COMPANIES—RIPARIAN RIGHTS — FILING PLAT—EFFECT—CONDEMNATION. The filing of a plat of its proposed location by a boom company desiring to appropriate the waters of a stream, does not give the boom company the right to injure the property of riparian proprietors without condemnation and compensation, in view of Rem. & Bal. Code, § 7110, providing for condemnation by boom companies of shore rights.

INJUNCTION—AGAINST OBSTRUCTION OF STREAM—DECREE—RIGHT OF CONDEMNATION—AGREEMENT. In an action to enjoin a boom company from impounding the waters of a river in such a manner as to affect the flow of a spring upon the land of a riparian owner, the defendant cannot complain that the decree did not provide for a temporary injunction until condemnation could be had, where the court found that the defendant had agreed to permit a sufficient flow of water at all times to avoid injury to the spring or to construct a dam below the spring to maintain the water at the necessary stage, and the decree merely required the defendant to conform to the agreement.

Appeal from a judgment of the superior court for Skamania county, McKenney, J., entered February 13, 1913, upon findings in favor of the plaintiffs, in an action for an injunction, tried to the court. Affirmed.

*George S. Shepherd,* for appellant.

*Walter G. Hayes* and *Miller, Crass & Wilkinson,* for respondents.

ELLIS, J.—The plaintiffs, as owners and tenants in common of certain lands in Skamania county, brought this action to secure a permanent injunction restraining the defendant from interfering with the natural flow of the waters of Wind river across those lands. The plaintiffs claim title as the widow and heirs at law of the original homesteader, Isadore St. Martin, who died intestate in 1910. On the land in question, is a valuable mineral spring of hot water, which flows from the ground within a few feet of the edge of the waters of Wind river at its ordinary stage. This spring has an established reputation for its mineral properties, and is largely patronized as a health resort. The plaintiffs maintain a hotel and camping accommodations for their

patrons and, for a consideration, permit the use of the waters of the spring. It requires the entire natural flow of the spring to accommodate the number of persons normally seeking its use in the dry summer season. For some unknown reason, the flow of the spring is so affected by the volume of water in the river that, when the flow of the river is obstructed above the spring, in the dry summer season, the spring furnishes only a small part of its normal supply, and is wholly insufficient to accommodate the plaintiff's guests and patrons. It is in the summer time that the withholding of the waters of the river thus injuriously affects the spring. It is also claimed that the waters of the spring are hotter when flowing copiously than when the flow is scant, the evidence tending to show a temperature varying from 104 degrees, Fahrenheit, when the flow is slight, to 118 degrees when the flow is copious. The normal temperature of the water of Wind river is about 55 degrees.

The defendant corporation was organized in March, 1900, under the laws of the state, as a boom and driving company for the purpose of driving logs and timber products on Wind river. On March 30, 1900, it filed its plat in the office of the secretary of state, by which it sought to appropriate the waters of Wind river and its tributaries and the contiguous shores for its driving operations. Wind river is an unmeandered nonnavigable stream, rising in the Cascade mountains, and flowing into the Columbia river, much of its course being through a rocky canon or defile. It is necessary to impound its waters by means of a dam to produce artificial freshets, called "splashes," to drive logs down the stream. In the summer and fall of 1901, the defendant erected a dam about twelve miles above the plaintiffs' premises. The gates of this dam are about twenty-five feet high, and the pond formed covers forty or fifty acres. Three floods or splashes in close succession, covering in all three days, were produced late in November, 1901. At that time, other streams tributary to Wind river below this dam were

not dammed. The appellant has since dammed these tributaries. The evidence shows that the impounding for these first splashes did not noticeably affect the spring. No other splashes were produced until the spring and summer of 1902. In the winter time, it requires only about six hours to fill the dam. In the summer time, it requires several days to impound water sufficient to make a splash. Other evidence, so far as material, will be considered in the discussion of the case.

The action was commenced March 23, 1912. The cause was tried to the court without a jury. The court found the facts in favor of the plaintiffs, and, on appropriate conclusions of law, adjudged that the defendant be enjoined from operating its dam in such a way as to interfere with the plaintiff's spring, or, as an alternative, erect and maintain, below the spring, a dam sufficient to maintain the water in the river at such stage as not to interfere with or diminish the flow of the spring during the operation of the impounding dam. The defendant appeals.

The appellant contends that the decree is contrary to the evidence in the following particulars: (1) that the respondents failed to show any title; (2) that there was no evidence that the spring was materially affected by the impounding of the water of the river; (3) that the appellant established a prescriptive right to obstruct the flow of the river by showing an adverse enjoyment for over ten years.

I. The contention that the respondents failed to prove title is based upon the fact that there was no proof of a ceremonial marriage between Isadore St. Martin, the deceased homesteader, and the respondent Margaret St. Martin, the mother of the other respondents, of whom the deceased was the father. The following testimony of one of the respondents was admitted without objection:

"Q. Do you know how your father acquired this property? A. It was his homestead. Q. Were your father and mother living together then as husband and wife? A. Yes,

sir. Q. And always lived together from that time on as husband and wife? A. Yes, sir."

It is argued that this was not the best evidence of the marriage, since Mrs. St. Martin was a witness and could have testified positively as to the marriage had there been one. The evidence given tended to prove the fact, and was not objected to as not the best evidence, or on any other ground. Had the appellant intended to rely upon this objection, it should have raised it at the time. The marriage was only a collateral issue. The evidence offered was sufficient to prove it, in the absence of such objection.

II. The claim that the respondents failed to show that the spring was materially affected by the impounding of the water of the river rests upon the assumption that, if the water of the river were so connected with the spring as to cause the spring to rise and fall with the river, the water in the spring would be cooler in periods of high water than in periods of low water. Practically all of the evidence on the subject was to the effect that the spring rises and falls with the rise and fall of the river, and that the water in the spring is hotter when the flow is greater than when the spring is low. It is argued that the latter statement is inherently unbelievable. This argument, however, proceeds upon an initial assumption that the access of the cold river water to the vein of the spring would, of necessity, cool the waters of the spring. An argument *a priori* such as this, to be of any value, must rest upon some admitted general principle or truth as a basis or cause. It is just here that the argument breaks down. To give it convincing force, it is necessary that we know and understand the operation of the hidden forces which control the flow of the water of the spring, and impart to it its temperature, but we neither know nor understand these forces in the present case. For example, it may be that the water in the spring flows more rapidly from the subterranean heating point when under the greater pressure supplied by the rise of the river, so that

it may not have the same time for cooling before reaching the surface as when this pressure is not applied. This is offered not as a theory, but as showing that the assumption that access to the vein of the spring by the water of the river would necessarily cool the water is only an assumption and not an established principle or truth, which would only give validity to appellant's argument. Clearly, in such a case, all that the court can do is to take the evidence of the objective phenomena without speculation as to their causes. There being no evidence to the contrary, we must accept these things as facts.

III. The appellant's claim of a prescriptive right to impound the waters of the river at all times of the year, regardless of any injury to the respondents' spring, cannot prevail, for two reasons. In the first place, there was no evidence that the respondents suffered any injury until the summer of 1902, which was less than ten years before the commencement of this action. In the second place, the evidence, taken as a whole, failed to show that the appellant's use of the river, as against the respondents', was hostile or adverse or under an unqualified claim of right. The evidence on all of these questions was sharply conflicting. On the one hand, there was evidence that the appellant's dam was built in 1901, and has been operated under a claim of right every summer since that time. On the other hand, the respondents' evidence strongly tended to show that the impounding of the water in the wet winter season does not appreciably affect the spring. It fairly appears that no damage was experienced by the impounding of the water for short periods in the fall of 1901, when only two or three floods were taken off. It is clear that the fact that the impounding of the water would affect the spring was not discovered until the summer of 1902. For the interference with the flow of the stream in the fall of 1901, the respondents had no cause of action, because they were not damaged. It is also clear from the evidence that the injury to the re-

spondents resulted only from the interference with the natural
flow of the river in the summer time, and that such interfer-
ence in the winter had no appreciable effect upon the spring.
We think that, both on reason and authority, the period of
a prescriptive right to an easement to use or damage the
lands of another can only begin to run from the time when
the person suffering the damage first had a cause of action
arising from the adverse use.

"In cases of this character the prescriptive right will not
commence to run until some act or fact exists giving the
party against whom the right is claimed a cause of action.
Where a right by prescription to maintain a railroad bridge
and change the current of a stream and injure the land of
a riparian owner below by causing it to wash away his land
is claimed, the commencement of the time required for the
prescription to ripen is not from the erection of the bridge,
but from the first actual damages to the land consequent on
the erection of the bridge. *Eells v. Chesapeake R. R. Co.*, 49
W. Va. 65, 38 S. E. 479; 87 Am. St. Rep. 787." *Roe v.
Howard County*, 75 Neb. 448, 106 N. W. 587.

"A prescriptive right to the use of water is not initiated
until the owners of the water 'are deprived of its use in such
a substantial manner as to notify them that their rights
are being invaded.' Long, Irrigation, § 90; *Hall v. Black-
man*, 8 Idaho 272, 60 Pac. 19; *McCoy v. Huntley*, 60 Ore.
372, 119 Pac. 481." *Sander v. Bull*, 76 Wash. 1, 135 Pac.
489

There was much evidence, also, to the effect that the
appellant's dam was not operated at any time during the
year 1908. This evidence would be of little force standing
alone, since a temporary interruption in the use of an ease-
ment will not alone establish an abandonment, or stop the
running of the period of prescription; but when taken in
connection with the evidence that the respondents' decedent
was at all times objecting to the use of the dam in the summer
time in such manner as to injure his spring, it has some ten-
dency to show that the use was not adverse and under an un-
qualified claim of right. Mrs. St. Martin testified that, after

the discovery of the fact that the impounding of the water injuriously affected the spring, the operation of the dam was acquiesced in by her husband upon an agreement with the president of the appellant company that water would be allowed to flow down the river whenever the respondents wanted it.   The president of the appellant company denied this, but, at the same time, admitted that he knew that his attorney was in negotiation, from time to time, with Mr. St. Martin concerning the matter.   Mrs. St. Martin's testimony was corroborated by another witness who testified that water was, from time to time in the summer of 1906, actually let out of the dam in order to raise the water in the respondents' spring.   Another witness testified that, on investigation as to the effect of the dam on the spring, in 1906, it was practically agreed by the appellant with St. Martin that the appellant would thereafter either let sufficient water flow in the river to supply the spring, or would build a dam in the river below the spring to keep the water at the height necessary for that purpose.   We think the evidence clearly preponderates in favor of the fact that the respondents' decedent never acquiesced in the appellant's use of its dam in such way as to injure the spring, and that the use of the dam was permitted upon the understanding testified to by these witnesses, which was, for a time at least, complied with by the appellant.

"The subsequent negotiation between the plaintiffs and the defendant, for a purchase, by the plaintiffs, is the strongest evidence to show that the use of the water on their part had not been adverse." *Watkins v. Peck*, 13 N. H. 360, 40 Am. Dec. 156.

Upon the evidence, the court would have been justified in finding that the injurious effect of the dam was not discovered until the summer of 1902; that the operation of the dam so as to injure the respondents' spring was not continuous for ten years even from the construction of the dam in 1901, and that its maintenance was merely permissive, on condition that

the dam should be so operated as not to injure the respondents' spring. In either case, the right to impound the water to the respondents' damage is not prescriptive. The burden was upon the appellant to prove an adverse, hostile, continuous and uninterrupted use under a claim of right. *District of Columbia v. Robinson,* 180 U. S. 92. It failed to maintain this burden.

We are not impressed with the appellant's claim that the filing of the plat of its proposed location conferred directly upon it the right of absolute dominion over the waters of the river. The authorities cited in support of this contention do not sustain it. In *Nicomen Boom Co. v. North Shore Boom & Driving Co.,* 40 Wash. 315, 82 Pac. 412, the contest was between rival boom companies. In such a case, it is elementary that the company making, in good faith, the first location has the better right. That case, however, does not hold that the mere filing of the plat gives to a boom company the right to injure the property of riparian proprietors without condemnation and compensation. The contrary is clearly implied by the analogy drawn by the court between the purpose of the filing of the plat of a boom company, and the filing of the plat of definite location by a railroad company. In support of this view, the court cites Ballinger's Code, § 4378 (Rem. & Bal. Code, § 7110; P. C. 405 § 149), which provides for the condemnation by boom companies of shore rights or other property sought to be appropriated in the manner provided by law for the appropriation of private property by railways, adding:

"The legislative scheme for boom companies requires that the land owner shall permit his land to be subjected to the use of such companies, upon receiving compensation therefor, and the title is thus acquired."

In *Berryman v. East Hoquiam Boom & Logging Co.,* 68 Wash. 657, 124 Pac. 130, the plaintiff not only had such notice as was given by the filing of the plat of the boom company in the office of the secretary of state, but also acquiesced

in the use of the stream by the boom company for a period of more than ten years apparently without objection. That decision is not authority for the position that the filing of the plat confers the right to injure a lower riparian proprietor without compensation. Such a construction of the law would render it void on constitutional grounds.

The evidence in this case would have justified the court in enjoining the operation of the appellant's dam during the summer season until such time as the right to injure the respondents' spring had been secured by condemnation and the damages assessed and paid. The appellant cannot complain of the decree rendered, if the court found, as the evidence would have justified it in finding, that the appellant had agreed either to permit a sufficient flow of the water at all times that the respondents' spring might not be injured, or to construct a dam below the spring to maintain the water in the river at the necessary stage. The decree merely requires that appellant conform to that agreement.

Judgment affirmed.

CROW, C. J., MAIN, CHADWICK, and GOSE, JJ., concur.