**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| BROCK MASLONKA and DIANE MASLONKA, a marital community, | ) ) ) | No. 37747-4-III |
| Appellants, | ) ) | |
| v. | ) ) | ORDER WITHDRAWING OPINION |
| PUBLIC UTILITY DISTRICT NO. 1 OF PEND OREILLE COUNTY; and PORT OF PEND OREILLE, | ) ) ) ) ) | |
| Respondents. | ) ) | |

THE COURT on its own motion finds that the opinion filed March 3, 2022, should

be withdrawn.

THEREFORE, IT IS ORDERED, the opinion filed March 3, 2022, is hereby

withdrawn and a new opinion will be filed this day.

PANEL: Judges Staab, Fearing, Lawrence-Berrey

FOR THE COURT:

_____
LAUREL SIDDOWAY
Chief Judge

**FILED**
**AUGUST 2, 2022**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| BROCK MASLONKA and DIANE MASLONKA, a marital community, | ) ) ) | No. 37747-4-III |
| Appellants, | ) ) | |
| v. | ) ) | PUBLISHED OPINION |
| PUBLIC UTILITY DISTRICT NO. 1 OF PEND OREILLE COUNTY; and PORT OF PEND OREILLE, | ) ) ) ) | |
| Respondents. | ) ) | |

STAAB, J. — Public Utility District Number 1 (PUD) of Pend Oreille County owns

and operates a dam that causes occasional flooding. Brock and Diane Maslonka own two

parcels of agricultural land, one of which abuts the Pend Oreille River. The Maslonkas

sued to enjoin future flooding and for compensation from past flooding. On summary

judgment, the superior court declared a prescriptive easement in favor of the PUD to

flood the Maslonkas' property. It dismissed the Maslonkas' damages claims for multiple

reasons, including statute of limitations, public duty doctrine as a defense to negligence,

and the subsequent purchaser rule as a defense to inverse condemnation. The Maslonkas

appeal.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

Although we conclude that a claim for prescriptive easement can be resolved on summary judgment with clear and convincing evidence, we recognize that proving the element of continuous and uninterrupted use is highly fact-specific. In this case, the PUD failed to demonstrate as a matter of law that it had continuously flooded the Maslonkas' property up to an identified level for a specific 10-year period. For similar reasons, we conclude that the PUD failed to prove the defense of subsequent purchaser rule sufficient to bar the Maslonkas' claim for inverse condemnation. The PUD's evidence does not clearly demonstrate that the PUD caused permanent damage to the Maslonkas' property above the express easement prior to 1993 when the Maslonkas purchased their property.

We therefore reverse dismissal of the Maslonkas' claims for inverse condemnation, trespass, and nuisance as to Parcel 2. We affirm summary judgment on all claims related to Parcel 1 on the alternative grounds that the Maslonkas have failed to present sufficient evidence to raise a genuine issue of material fact.

BACKGROUND

A. FACTUAL HISTORY

1. *The Maslonkas (servient estate)*

Brock and Diane Maslonka own 535 acres of farm and pasture land near Cusick, in central Pend Oreille County. The Maslonkas purchased the property in 1993. For purposes of this case, the parties refer to the property as Parcel 1 and Parcel 2. The

2

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

following image is taken from the County's GIS[1] database and is a reproduction of

Clerk's Papers (CP) at 130.



The Pend Oreille River forms the eastern border of Parcel 2. The Maslonkas' property abuts the river for approximately a mile. When purchasing the property in 1993, Mr. Maslonka was aware that the lower portion of Parcel 2 flooded periodically.

When the water is high for a day or two, it has little impact, but it has a substantial negative impact on Mr. Maslonka's farming operations when it is high for a month or two. According to Mr. Maslonka, the flooding that occurred when he purchased the property was of the former character. He contends that since about 1999, the flooding has increasingly taken on the latter character. He believes that the cause of this increased frequency and duration of flooding is the result of changes in the PUD's operations following an amendment to its license in 1999, granted by the Federal Energy Regulatory Commission (FERC). The history of that license amendment is detailed below in our discussion of the Tribal Litigation.

---

[1] Geographic information system.

3

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

2. *Perkins Slough Diking Improvements*

Perkins Slough runs through Parcel 1. Similar to Parcel 2, Parcel 1 has also developed a flooding problem. Mr. Maslonka believes that the cause of this flooding is a defect in diking improvements, allowing the Pend Oreille River to flow onto Parcel 1. Mr. Maslonka believes that the PUD's responsibility is to maintain these improvements in proper working order.

The slough's water levels are kept in check by a culvert and gate that lead to the river. The lines running diagonally through the image on the previous page are railroad tracks owned by the Port of Pend Oreille. The tracks sit atop an elevated embankment. The Perkins Slough culvert runs under this embankment and terminates at a gate installed on the river side of the embankment.

This image is the culvert gate on the river side of Perkins Slough, copied from CP at 397.

When the river floods its banks, the gate is closed and the railroad embankment acts as an earthen dam or dike, keeping the river from flooding Parcel 1. When the river recedes, the gate is opened, allowing water to drain out of the slough and into the river. Water



4

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

accumulates naturally in the slough from precipitation and the river's tributaries (specifically Trimble Creek); thus, the need to drain the slough.

The culvert was initially installed by the Idaho and Washington Northern Railroad, the predecessor of the current owner, Port of Pend Oreille. In 1909, Diking District No. 1 of Pend Oreille County installed a gate at the end of the culvert. Throughout the early 1900s, the diking improvements benefitting Perkins Slough were operated by the Diking District.[2]

In 1962, the railroad replaced the culvert. At that same time, the PUD replaced the gate. In 1963, the PUD entered an agreement with the Diking District, and the PUD assumed responsibility for both operating and maintaining the gate. Absent from that document is any responsibility for maintaining the culvert, which was owned and installed by the railroad.

The PUD assumed responsibility for maintaining many of the diking improvements along the river because its federal "license requires that project operations not add or cause flooding in the diking districts." CP at 673. For a long time, the Diking District still operated the gate, while the PUD handled maintenance. During some periods, the Diking District operated the gate to impound water, which could then be diverted for irrigation.

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

In 2008, the PUD entered into another agreement with the Diking District. This agreement superseded the 1963 agreement. Again, this agreement obligated the PUD to maintain and operate the gate, but explicitly disclaimed any obligation for "replacement or repair to the culvert." CP at 324. The agreement details when the gate is supposed to be raised and lowered and also obligates the PUD to "use its best efforts" to accommodate any requested variances to facilitate "specific agricultural needs." CP at 324, 325. For years, Mr. Maslonka served as a commissioner on the Diking District. Mr. Maslonka signed the 2008 agreement in his capacity as a Diking District Commissioner.

In 2015, the Diking District voted to disband. In 2016, Pend Oreille County accepted the Diking District's vote to suspend operations. Upon disbanding, the County took over the Diking District's statutory obligations, as required by RCW 85.38.220.[3]

*3. Box Canyon Dam (dominant estate)*

In 1955, the PUD completed construction of the Box Canyon Dam on the Pend Oreille River. The dam is located approximately 32 miles downriver (North) of the

---

[2] Two other diking districts also exist in the area, managing culverts, gates, and pumps along other areas of the river. Diking districts are organized under chapter 85.05 RCW.

[3] "No special district that owns drainage or flood control improvements may be suspended unless the legislative authority of a county accepts responsibility for operation and maintenance of the improvements during the suspension period."

6

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

Maslonkas, near Ione.  The dam produces about 50-55 MW[4] per hour, year-round.  The purpose of the dam is to generate low-cost electricity for customers.

Box Canyon Dam is considered a "run of the river" (ROR) dam.  A dam is considered ROR if it stores little or no water.  ROR dams attempt to maintain relatively similar flow rates upstream and downstream.  What little water these dams do store is called pondage.  Pondage allows ROR dams to balance hourly load fluctuations.  While the pondage is much smaller than the reservoirs maintained by some reclamation projects, such as the Grand Coulee,[5] the pondage still affects substantial acreage.  According to FERC, Box Canyon's reservoir covers between 7,000 and 9,000 acres of surface area.

Because ROR dams store little or no water, their ability to generate electricity is subject to seasonal variations in flow rates.  To firm up the supply of electricity, ROR dams are often built in conjunction with larger reservoir dams.  In this instance, Albeni Falls Dam, 55.7 miles upriver (SE) from Box Canyon Dam, impounds the waters of Lake Pend Oreille.  By storing water year-round, Albeni Falls is able to maintain minimum flow rates on the Pend Oreille River, which allows Box Canyon and other downriver ROR dams to generate electricity year-round.

---

[4] Megawatt.

[5] Some of the Northwest's better known ROR dams include: Bonneville, Chief Joseph, The Dalles, John Day, and McNary.  Despite being ROR, these dams are each able to generate over 1,000 MW of power.

7

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

The United States Army Corps of Engineers operates Albeni Falls Dam. While the PUD has no authority over Albeni Falls Dam, the dams' operators communicate regularly, coordinating operations daily. According to FERC, it takes anywhere from 1.7 days to 34 days for water leaving Albeni Falls to reach Box Canyon, depending on velocities. The dam operators communicate so that the PUD can accurately plan how much electricity it can generate and accurately adjust its operations to stay within the parameters of its FERC license.

In its natural state, the Pend Oreille River's high water mark is 2028 feet above sea level.[6] The dam gives the PUD the ability to raise the river's upriver high water mark significantly higher than 2028 feet. The difference between the natural high water mark and the artificial high water mark created by the dam is referred to as the dam's "backwater effect." Disregarding the high flow months (May–July), the dam causes approximately 6-8 feet of backwater.

In other words, during times when the river would naturally submerge lands up to 2022 feet, the dam will submerge additional land up to 2028–2030 feet.

However, this effect is not uniform throughout the project's boundaries (i.e., the land between the Albeni Falls Dam and Box Canyon Dam). Box Canyon Dam causes

---

[6] Elevation references are to the measurements taken at the gauge in Cusick. The PUD's license from FERC and the PUD's easement with the Maslonkas both use the Cusick gauge as the reference point for monitoring the dam's backwater effect on the river.

8

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

significantly higher water levels at the Box Canyon end of the dam than at the Albeni

Falls end.  But, where the Maslonkas are, 6-8 feet is a close estimate.

4. *Dam Operations*

According to Mark Cleveland, the dam's Director of Power Production and

CR 30(b)(6) designee, "All of the water in the River is discharged through the dam in one

of three ways:"

> (1) flows up to approximately 32,000 cfs[7] are diverted and discharged
> through the powerhouse to produce power; (2) flows between
> approximately 32,000 cfs and 70,000 cfs are discharged through both the
> powerhouse and spillway gates; or (3) for flows between 70,000 cfs to
> 90,000 cfs the forebay at the dam is lowered to prevent elevation at the
> Cusick Gauge from rising above [elevation] 2041 [feet].  When flows reach
> 90,000 cfs all gates are removed[8] and elevation at the Cusick Gauge is as
> if Box Canyon dam did not exist.

CP at 115, 114, 787.  According to the PUD's operations manual, this allows the PUD "to

maximize generation" while staying within the limits of its license set by FERC.  CP at

525.

The dam starts to lift spillway gates at approximately 32,000 cfs because flows

above that level "exceed powerhouse capacity."  CP at 514.  If the dam did not begin

lifting spillway gates at that level, it would not be able to "maintain reservoir outflow

---

[7] Cubic feet per second.
[8] According to the PUD's operations manual, the river may reach 2041 feet at
flows ranging from 82,000 cfs to 90,000 cfs, depending on the backwater effect from
Boundary Dam "and other factors."  CP at 524.  Boundary is a dam owned by Seattle
City Light, located north of Metaline Falls, downriver from Box Canyon Dam.

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

equal to the inflow." CP at 514. At that level, the river is only at 2035.1 feet (within

FERC's operating limit and within the Maslonkas' easement limit). Despite not being at

2041 feet at flows of 32,000 cfs, the PUD starts lifting gates because if it did not it would

not be operating as a ROR dam, as required by its FERC license, and would generate

more than 2 feet of backwater on Albeni Falls, also in violation of its FERC license.

At 35,000 cfs, the river reaches the PUD's easement limits on the Maslonkas'

property. Without the dam, the river would not reach 2035.5 feet (the easement limit)

until flows reached 61,000 cfs. With the dam in place, the river reaches 2041 feet (FERC

limit) at flows between 69,000 cfs and 90,000 cfs. Without the dam, the river would not

reach 2041 feet until flows reach 90,000 cfs.

One of the PUD's expert witnesses, Scott Mahnken, conducted an analysis to

determine how much of the river's time spent above 2035.5 feet was due to the dam and

how much was due to nature. Using the dam's hourly readings from the Cusick gauge,

Mr. Mahnken determined that between 1955 and 1995, the river exceeded 2035.5 feet on

average about 12 percent of the year. According to Mr. Mahnken, that percentage would

have been 6 percent without the dam. Thus, over 40 years the dam was responsible for

approximately half of the instances where the river exceeded 2035.5 feet. Six percent of

a year equals 21.9 days, which is why the parties' briefing frequently talks about 21-22

days of flooding per year. However, these are just averages.

10

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

Mr. Mahnken did a more detailed look at the four years comprising 2015-2018. In 2015, the river exceeded 2035.5 feet on 18 days. This rose to 34 days in 2016, 99 days in 2017, and 66 days in 2018. Thus, while the total average of days above 2035.5 feet might be 12 percent of the year, in any given year, that percentage could be vastly different—as seen by 2015's 5 percent of the year (18 days) or 2017's 27 percent of the year (99 days). Mr. Mahnken attributed the large increases in 2017 and 2018 to being unusually wet years but did not break down how many of those days were due to nature and how many were due to the dam. As will become clear later in this opinion, Mr. Mahnken's use of averages, instead of year-by-year breakdowns, significantly limits this court's ability to resolve this appeal.

Another significant limitation in Mr. Mahnken's analysis is that he only looked at days where the river's elevation exceeded 2035.5 feet, but not the degree of excess. Thus, the record contains no way for the court to determine how much of the year is spent at 2035.6 or 2041 feet or anywhere in between.

5.  *Dam Limitations*

Recognizing that the dam submerges land that would normally be above water, the PUD promised to compensate land owners for flooding and damage to their lands. For the most part, the PUD kept that promise.

In 1955 (when construction was completed), the dam purchased a flood easement from the Maslonkas' predecessors. In 1960, the PUD purchased an additional easement,

11

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

permitting the PUD to backwater the river up to 2035.5 feet. The specific right granted

is:

> The full perpetual right, power, privilege and easement to intermittently or
> continuously overflow, flood and submerge, or to damage by wash, erosion,
> sloughage, seepage, inundation, or other cause, the above-described lands
> with waters of the Pend Oreille River and its tributaries, all in the
> construction, operation and maintenance of the Box Canyon Dam and
> Hydroelectric Project, its appurtenances, reservoir and overflow area.

CP at 328.

Both parties agree that these are the only express easements covering the

Maslonkas' property, that they only apply to Parcel 2, and that the PUD has no express

easement on Parcel 1.

In addition to its easement limits with surrounding property owners, federal

regulation imposes three main constraints on the dam's operations. The dam may not

allow more than two feet of backwater against Albeni Falls Dam, may not drawdown

faster than 3 inches per hour, and must remove all spillway gates when the river reaches

2041 feet. These constraints come from the PUD's license from FERC to operate Box

Canyon Dam.[9]

---

[9] FERC requires owners of hydropower facilities to maintain a license from the
agency as part of the agency's duties to implement the Federal Power Act, other federal
energy statutes, and federal environmental statutes. *See* https://www.ferc.gov/industries-
data/hydropower (last updated Dec. 8, 2021).

12

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

The drawdown limitation and the two-foot backwater limitation were not part of the dam's license when the PUD purchased its easements from the Maslonkas' predecessors. Both limitations carry the potential to worsen upstream flooding in comparison to the flooding that was likely contemplated when the easements were purchased. The drawdown limitation carries the potential to force the PUD to drawdown slower than it otherwise might, which carries the potential of extending the duration of upstream flooding. The original backwater limitation, when the easements were purchased, was one-foot against Albeni Falls. By increasing that limit to two-feet, FERC greatly increased the PUD's authority under federal law to store water upstream.[10]

While FERC administers federal energy and environmental law, it does not administer Washington's common law of property or federal Indian law, which leads to the Kalispel cases.

---

[10] As will be discussed in greater detail in the next subsection, the two-foot backwater amendment was found by FERC to have caused 492 acres of flooding on Tribal land, touching off two decades of litigation. *See Public Utility District No. 1 of Pend Oreille County*, 112 FERC ¶ 61055, 61409 (2005) ("Initially, the project was operated in a manner that allowed the Tribe to continue its seasonal use of the land for growing wild hay. However, in 1963 the license was amended to increase the allowable backwater from one to two feet at Albeni Falls, again without full recognition of flooding effects on the reservation or consideration of the possible applicability of sections 4(e) or 10(e). As a result, the project flooded some 492 acres of land within the Kalispel Reservation, comprising approximately ten percent of the total acreage of the reservation, making them unavailable for the Tribe's use.").

13

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

B. PROCEDURAL HISTORY

1. *Tribal Litigation*

The PUD spent the entirety of the 1980s and 1990s in litigation against the Kalispel Indian Tribe. *United States v. Pend Oreille County Pub. Util. Dist. No. 1*, 926 F.2d 1502 (1991) (*Kalispel* I); *United States v. Pend Oreille County Pub. Util. Dist. No. 1*, 28 F.3d 1544 (9th Cir. 1994) (*Kalispel* II); *United States v. Pend Oreille County Pub. Util. Dist. No. 1*, 135 F.3d 602 (9th Cir. 1998) (*Kalispel* III). The *Kalispel* cases are tangentially relevant as the PUD cites to them briefly in its opening brief and because the reservation is directly across the river from the Maslonkas' property and of similar character to the Maslonkas' property. Neither party, however, alleges that the *Kalispel* cases have any collateral estoppel effect on this case. Below, the trial court granted a motion by the PUD to exclude consideration of the *Kalispel* lawsuits and settlements as evidence of liability. The primary purpose of detailing this history here is for additional background information—explaining why the PUD's license was amended in 1999 to incorporate the PUD's settlement with the Tribe, which effectively granted the PUD the right to flood the Tribe's lands up to 2041 feet.[11]

---

[11] Article 33 of the dam's original license required the PUD to operate the dam "in such a manner as not to interfere with or damage Indian land of the Calispel Indian Reservation, or, in case such damage should occur as a result of the operation of the project, the Indians shall be compensated by the licensee." *Public Utility District No. 1 of Pend Oreille County, Wash.*, 11 F.P.C. 786, 791 (1952).

14

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

The United States, as trustee for the Kalispel Tribe, sued the PUD for flooding the

tribe's reservation lands:

> Prior to construction of the [Box Canyon] dam, the water level of the river
> as it passed the reservation reached approximately 2041 feet during the
> spring, receded to 2022 feet by late summer, and remained at that level
> until the following spring. After completion of the dam, the spring level
> remained at 2041 feet, but during the remaining months of the year the
> water level rarely dropped below 2032 feet. Thus, because of the dam, land
> once flooded only in the spring was under water all year.

*Kalispel* I, 926 F.2d at 1504. The specific cause of action brought was for trespass and

the relief sought was both damages and injunctive relief. *Id*. at 1504. The United States

filed the lawsuit in 1980. *Kalispel* III, 135 F.3d at 606.

The district court found the PUD liable for trespass following a bench trial. The

PUD never negotiated an overflow easement with the tribe as it had with private

landowners in the 1950s. The district court found the PUD liable for permanently

submerging lands below 2032 feet and periodically submerging lands up to 2041 feet.

The Ninth Circuit Court did not get into detail about the evidence submitted at trial but

affirmed the district court's verdict, noting that it was "well supported by the record."

*Kalispel* I, 926 F.2d at 1506.

In *Kalispel* II, the Ninth Circuit Court addressed the remedy phase of the bench

trial, which the district court had severed from the liability portion. Although *Kalispel* II

ostensibly concerned damages, the PUD attempted to relitigate liability. The Ninth

Circuit's opinion reveals that the PUD had initially attempted to negotiate an easement

15

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

with the tribe as it had with neighboring private land owners but that the tribe refused to grant an easement. *Kalispel* II, 28 F.3d at 1547 n.2. "[T]he Utility knew it had no right to flood Reservation land, but flooded it anyway." *Id*. at 1547. The PUD attempted to argue that it had acquired a right to flood the reservation lands through inverse condemnation; the Ninth Circuit Court rejected that argument because federal law prohibited the PUD from condemning tribal land without prior Bureau of Indian Affairs permission. *Id*. at 1548.

As to damages, the Ninth Circuit Court ruled that the district court had failed to adhere to federal law and applied the wrong measure of damages and remanded for the court to reassess damages. *Id.* at 1550-51. The circuit court also ordered the lower court to consider whether to issue an injunction, which would prohibit the PUD from elevating the water level above its natural high water mark of 2028 feet, and also suggested the lower court issue a stay of any injunction to permit the PUD to apply for a license amendment to permit "occupying Reservation land." *Id*. at 1552.

On remand, the district court awarded the tribe more than $3,000,000 in damages. *Kalispel* III, 135 F.3d at 606-07. As recommended in *Kalispel* II, the district court also "granted a permanent injunction prohibiting PUD from flooding above 2028 feet, but stayed the injunction to allow PUD to apply to the Commission for a license amendment." *Kalispel* III, 135 F.3d at 607. The Ninth Circuit Court affirmed the new damages award, the permanent injunction, and the stay. *Kalispel* III, 135 F.3d at 615.

16

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

In 1999, the PUD and the Tribe reached a settlement, which FERC approved and incorporated into the PUD's Box Canyon Dam license, thus ending two decades of litigation. The new license expanded the project boundaries to include the portions of the tribe's lands the PUD had been flooding for decades, enlarged the PUD's authority to store water up to 2041 feet, and required additional payments to the tribe, the federal government, and the county for erosion control, habitat preservation, and monitoring. Had FERC not issued the license amendment, it would have "force[d] the PUD to change project operations so that waters from the Box Canyon reservoir did not rise above elevation 2028 at Cusick, except at times when water would be that high naturally." CP at 670. In other words, Box Canyon Dam would have been forced to cease generating electricity, except for a small portion of the year.

In 1999, following resolution of its litigation with the Kalispel Tribe, the question arose as to whether the PUD would be responsible for similar damages to other property owners. In an internal memorandum, the PUD stated that it did not need to initiate condemnation proceedings to allow it to continue operating up to 2041 feet because the PUD believed it had already acquired prescriptive easements, relying instead on a policy of waiting for individual landowners to bring lawsuits:

> The District has not been required to institute condemnation proceedings on private lands along the project boundary to date because **the prescriptive easements on these lands authorizes its use by the District** and flowage easements were obtained in some cases through negotiations with the landowners. The District has no plans at this time to begin condemnation

17

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

> proceedings on any private lands along the project reservoir. **The landowners may bring a suit against the District, if they wish**. Such suit would be in the nature of an inverse condemnation action. The District would defend and claim its prescription easement if an inverse condemnation action were brought.

CP at 1409 (emphasis added). Almost 20 years after the conclusion of the *Kalispel* cases, the Maslonkas filed their lawsuit against the PUD.

2. *Complaint, Answer, and Counterclaim*

The Maslonkas filed suit against the PUD on December 9, 2016. The complaint seeks injunctive relief and compensation for diminution of property value and damage to crops under theories of unlawful takings in violation of article I, § 16 of Washington's Constitution, inverse condemnation, trespass, nuisance, and negligence.

The PUD's answer to the complaint included a counterclaim requesting the declaration of a prescriptive easement. The PUD alleged its prescriptive easement vested "in or about 1965." CP at 31.

The Maslonkas also sued the Port (the current owner of the railroad embankment). The Port was dismissed from the case upon settling with the Maslonkas. The claims against the Port revolved around Parcel 1 and whose responsibility it is to maintain the Perkins slough culvert and diking improvements.

3. *Motion for Partial Summary Judgment*

In 2019, the PUD moved for partial summary judgment. The PUD raised four grounds for dismissal of the various claims: failure to state a claim, subsequent purchaser

18

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

rule, statute of limitations, and public duty doctrine. Not every ground for dismissal applied to every cause of action or to both parcels.

On the PUD's motion, the superior court dismissed, with prejudice, the inverse condemnation claim as to Parcels 1 and 2 based on the subsequent purchaser rule. The court dismissed the negligence claim as to Parcel 1 under the public duty doctrine. The court denied the rest of the PUD's motion for summary judgment and denied the Maslonkas' cross-motion for summary judgment on trespass liability.

The PUD moved for reconsideration on the negligence claim for Parcel 2. After further review, the court granted reconsideration and dismissed the negligence claim as to Parcel 2 as barred by the statute of limitations.

*4. Second Motion for Summary Judgment*

Approximately one year later, the PUD brought a motion for full summary judgment. The crux of the PUD's motion was that the Maslonkas were maintaining inconsistent positions. The PUD argued the trespass and nuisance claims were time barred, and the Maslonkas defended by arguing that the torts were ongoing. The PUD alternatively argued that it had acquired a prescriptive easement and the Maslonkas defended by arguing that the PUD had not proved continuous use. The PUD believed that the Maslonkas could not have it both ways: the use was continuous or it was not, but either way the Maslonkas' lawsuit was procedurally barred.

19

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

The superior court entered an order disposing of the Maslonkas' remaining claims by finding that the PUD was vested with a prescriptive easement up to 2041 feet. At the hearing where the court announced its decision, it stated that the prescriptive easement vested "no later than 1999" but did not explain how it reached that conclusion.

The table below highlights the trial court's basis for dismissing each claim, combining the order on partial summary judgment, order on reconsideration, and second order on summary judgment.

| | Insufficient Evidence | | Subsequent Purchaser | | Statute of Limitations | | Public Duty Doctrine | | Prescriptive Easement | |
|---|---|---|---|---|---|---|---|---|---|---|
| | P1 | P2 | P1 | P2 | P1 | P2 | P1 | P2 | P1 | P2 |
| **Condemnation** | D | N/A | G | G | N/A | N/A | N/A | NA/ | N/A | N/A |
| **Trespass** | D | N/A | NA/ | D | D | D | N/A | N/A | G | G |
| **Nuisance** | D | N/A | N/A | D | D | D | N/A | NA/ | G | G |
| **Negligence** | D | N/A | N/A | N/A | D | G | G | D | N/A | N/A |

G = grant summary judgment to dismiss; D = denied summary judgment to dismiss; N/A not argued by PUD. Claims for Parcel 1 = P1 and claims for Parcel 2 = P2.

ANALYSIS

A. STANDARD OF REVIEWING SUMMARY JUDGMENT

"When reviewing an order for summary judgment, the appellate court engages in the same inquiry as the trial court." *Mountain Park Homeowners Ass'n v. Tydings*, 125 Wn.2d 337, 341, 883 P.2d 1383 (1994) (citing *Syrovy v. Alpine Ress, Inc.*, 122 Wn.2d 544, 548-49 n.3, 859 P.2d 51 (1993)). "This court will affirm summary judgment if no genuine issue of any material fact exists and the moving party is entitled to judgment as a

20

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

matter of law." *Id.* "All facts and reasonable inferences are considered in the light most favorable to the non-moving party, and all questions of law are reviewed de novo." *Id.* (citation omitted). "But a question of fact may be determined as a matter of law when reasonable minds can reach only one conclusion." *Miller v. Likins*, 109 Wn. App. 140, 144, 34 P.3d 835 (2001) (citing *Ruff v. County of King*, 125 Wn.2d 697, 887 P.2d 886 (1995)). Furthermore, "[a]n order granting summary judgment may be affirmed on any legal basis supported by the record." *Martinez-Cuevas v. DeRuyter Bros. Dairy, Inc.*, 196 Wn.2d 506, 514, 475 P.3d 164 (2020) (citing *Coppernoll v. Reed*, 155 Wn.2d 290, 296, 119 P.3d 318 (2005)).

"A nonmoving party may not defeat a motion for summary judgment by relying on speculation or argumentative assertions that unresolved factual issues remain." *Williams Place, LLC v. State*, 187 Wn. App. 67, 84, 348 P.3d 797 (2015) (citing *White v. State*, 131 Wn.2d 1, 9, 929 P.2d 396 (1997)).

B.  PRESCRIPTIVE EASEMENT

The Maslonkas assert that the PUD's operation of Box Canyon Dam has caused flooding on their land above the express easement of 2035.5 feet. They contend that this flooding constitutes a taking and have filed a claim for inverse condemnation. In the alternative, to the extent that the flooding does not amount to a taking, they contend that the flooding is a trespass and nuisance.

21

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

The PUD acknowledges that it has been flooding the Maslonkas' land for decades. It contends, and the trial court agreed, that the Maslonkas' claims for trespass and nuisance fail because the PUD acquired a prescriptive easement to flood above 2035.5 feet. The trial court also dismissed the Maslonkas' claims for inverse condemnation, finding that any permanent damage to the value of the Maslonkas' property caused by the flooding occurred before the Maslonkas purchased their property in 1993.

On appeal, we tackle PUD's claim for a prescriptive easement first because the resolution of this issue will provide background and analysis for the other issues.

Prescriptive easements are a common law companion to adverse possession. Adverse possession grants full title to real property, while a prescriptive easement grants only a right to use someone else's property. "'Prescriptive rights . . . are not favored in the law, since they necessarily work corresponding losses or forfeitures of the rights of other persons.'" *Gamboa v. Clark*, 183 Wn.2d 38, 43, 348 P.3d 1214 (2015) (quoting *Nw. Cities Gas Co. v. Western Fuel Co.*, 13 Wn.2d 75, 83, 123 P.2d 771 (1942)). "To establish a prescriptive easement, the person claiming the easement must use another person's land for a period of 10 years and show that (1) he or she used the land in an open and notorious manner, (2) the use was continuous or uninterrupted, (3) the use occurred over a uniform route, (4) the use was adverse to the landowner, and (5) the use occurred with the knowledge of such owner at a time when he was able in law to assert and enforce his rights." *Id.* (internal quotation marks omitted).

22

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

The primary dispute in this case concerns the second element: 10 years of continuous and uninterrupted use. More specifically, the parties dispute the degree to which the law permits seasonal or intermittent use to ripen into continuous use and whether the facts of this case satisfy that law.

As a preliminary matter, the Maslonkas argue that this element is always a question of fact that can never be decided on summary judgment. Conversely, the PUD argues that not only can a prescriptive easement be declared on summary judgment, but its burden of proof is only a preponderance of the evidence. We address these initial concerns before analyzing the PUD's substantive claim for a prescriptive easement.

Ultimately we hold that the element of continuous and uninterrupted use can be decided on summary judgment, but the PUD's burden of proof is clear and convincing evidence. In this case, the PUD failed to meet this burden on summary judgment because it failed to clearly show that it had continuously flooded the Maslonkas' property up to an identified level for a specific 10-year period.

*1. The Element of Continuous and Uninterrupted Use is Susceptible to Summary Judgment*

Quoting from *Johnson v. Brown*, 33 Wash. 588, 74 P. 677 (1903), the Maslonkas argue that the "continuous or uninterrupted" use element is never susceptible to summary judgment. At the end of *Johnson* the Supreme Court stated, in relevant part: "the question of continuous, open, and notorious possession being a question of fact purely

23

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

within the province of the jury to determine." *Id.* at 590. The Maslonkas believe that the Supreme Court foreclosed summary judgment of this element based on this statement.

This comment in *Johnson* is not controlling because it is dictum and has been rendered obsolete by subsequent court rules and precedent. *Johnson* was concerned with sufficiency of the evidence, not whether a judge could have decided the question instead of the jury. Thus, the court's remark about questions of fact being the jury's province was unnecessary to the court's resolution of the lawsuit.

Furthermore, summary judgment did not exist in 1903. At that time, Washington's civil procedure included precursors to CR 12(b) and CR 50, but not CR 56. LAWS OF 1891, § 2, at 106; LAWS OF 1895, § 1, at 64. Summary judgment did not come into being until 1955, when the Supreme Court amended RPPP 19.[12] 46 Wn.2d at xxxvi (1955). Johnson cannot be read to have foreclosed a procedure that did not yet exist.

Finally, it is well established that "when reasonable minds could reach but one conclusion, questions of fact may be determined as a matter of law" on summary judgment. *Hartley v. State*, 103 Wn.2d 768, 775, 698 P.2d 77 (1985) (citing *LaPlante v. State*, 85 Wn.2d 154, 531 P.2d 299 (1975)). The Maslonkas offer no rebuttal to this well-known legal standard. Accordingly, the trial court did not err in ruling that this element may, under the right circumstances, be decided on summary judgment.

---

[12] Rules of Pleading Practice and Procedure. RPPP 19 was later recodified as RPPP 56 and became CR 56 in 1967. 71 Wn.2d at cxvii – cxix (1967).

24

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

While we hold that the element of "continuous and uninterrupted use" can be decided on summary judgment, we also recognize that summary judgment will be the exception given its highly fact-specific nature. We note that almost every case discussed in this opinion was decided after a trial.

2. *The Burden of Proving a Prescriptive Easement is Clear and Convincing*

Washington has never had cause to decide the burden of proof for prescriptive easements explicitly.

The PUD cites *Hebish* to argue that the burden of proof is a preponderance of the evidence. Resp't's Br. at 27 (citing *Hebish v. Pac. County*, 168 Wash. 91, 94, 10 P.2d 999 (1932)). *Hebish* unequivocally states that the party seeking a prescriptive easement must "prove by a preponderance of the evidence their right." *Id.* But, the burden of proof was not actually at issue in *Hebish*, and the court did not explain its comment. The only issue in *Hebish* was whether specific evidence was relevant to tacking. In *Hebish*, Pacific County claimed that a public road ran through Hebish's property via prescription. The strip of land at issue was 537 feet running north/south. Pacific County's evidence showed that settlers had cut a trail through Hebish's property. However, the trail was to the west of the easement that Pacific County was trying to establish. In other words, Pacific County tried to tack historical use of an abandoned trail to the west onto its easement claim for a new road further to the east of that abandoned trail. The trial court

25

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

and Supreme Court both rejected Pacific County's claim. *Hebish*, 168 Wash. at 93-94.

Thus, *Hebish*'s stray remark about the burden of proof was dicta.

Accordingly, this court is not bound to follow *Hebish* because "[s]tatements made

in the course of the Supreme Court's reasoning that are 'wholly incidental' to the basic

decision constitute dicta and do not bind us." *State v. Hummel*, 165 Wn. App. 749, 765,

266 P.3d 269 (2012); *Peterson v. Hagan*, 56 Wn.2d 48, 53, 351 P.2d 127 (1960).

Furthermore, *Hebish* has only been cited once in its approximately 90-year history. That

citation came in 1935's *Stevens County v. Burrus*, 180 Wash. 420, 425, 40 P.2d 125

(1935). There, the Supreme Court cited *Hebish* for the elements of prescriptive

easements but did not carry over *Hebish*'s statement concerning the burden of proof.

Post-*Hebish*, several Court of Appeals cases have stated the burden of proof for

prescriptive easements to be "clear proof" or that the elements must be "clearly

established." *Lee v. Lozier*, 88 Wn. App. 176, 185, 945 P.2d 214 (1997) (clear proof);

*Smith v. Breen*, 26 Wn. App. 802, 804, 614 P.2d 671 (1980); *Adams v. Skagit County*, 18

Wn. App. 146, 150, 566 P.2d 982 (1977) (clear proof); *Roberts v. Smith*, 41 Wn. App.

861, 866, 707 P.2d 143 (1985) (clearly establishes). Contrary to the PUD's claim that

"clear proof" is a non-existent burden of proof, "clear proof" is recognized as an

intermediate burden of proof synonymous with "clear and convincing." 5 KARL B.

TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 301.3, at 198 n.35

(6th ed. 2016) (citing *Premium Distrib. Co., v. Int'l Bhd. of Teamsters Union Local 174*,

26

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

35 Wn. App. 36, 40, 664 P.2d 1306 (1983)). *Premium Distributing* held that use of the term "clear proof" in RCW 49.32.070 meant an intermediate burden of proof "more than a preponderance of the evidence." *Id*. at 40 (citing *United Mine Workers of America v. Gibb*, 383 U.S. 715, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)). In *United Mine Workers*, the United States Supreme Court held that "clear proof" as used in the Labor Management Relations Act signifies "a meaning like that commonly accorded such similar phrases as 'clear, unequivocal, and convincing proof.'" *United Mine Workers* at 737.

Washington has firmly established "clear and convincing" as the burden of proof in the analogous areas of adverse possession and equitable estoppel. *Thor v. McDearmid*, 63 Wn. App. 193, 207, 817 P.2d 1380 (1991) (citing *Silver Surprize, Inc. v. Sunshine Mining Co.*, 88 Wn.2d 64, 66, 558 P.2d 186 (1977)); *Heriot v. Lewis*, 35 Wn. App. 496, 500, 668 P.2d 589 (1983) (citing *Muench v. Oxley*, 90 Wn.2d 637, 584 P.2d 939 (1978)); *Pioneer Nat'l Title Ins. v. State,* 39 Wn. App. 758, 761, 695 P.2d 996 (1985) (citing *Chem. Bank v. Wash. Pub Power Supply Sys.*, 102 Wn.2d 874, 905, 691 P.2d 524 (1984)). Like adverse possession and equitable estoppel, a prescriptive easement is an equitable remedy that is "disfavored" in the law. It is reasonable to apply the same burden of proof to all three remedies.

Looking outside of Washington, the weight of authority holds that the burden in prescriptive easement cases is "clear and convincing." *Wareing v. Schreckendgust*, 280

27

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

Mont. 196, 206, 930 P.2d 37 (1996) (clear and convincing); *Stricker v. Knaub*, 215 Neb.

372, 377, 338 N.W.2d 757 (1983) (clear, convincing, and satisfactory evidence); *Burkett*

*v. Smyder*, 369 Pa. Super. 519, 522, 535 A.2d 671 (1988) (clear and positive); *Pettus v.*

*Keeling*, 232 Va. 483, 486, 352 S.E.2d 321 (1987) (clear and convincing).

Finding ourselves unchained from the dicta in *Hebish*, we follow the great weight

of authorities and logic and hold that a party asserting a prescriptive easement must prove

each element by clear and convincing evidence.

### 3. The PUD Failed to Prove 10 years of Continuous and Uninterrupted Use

As noted above, the parties disputed the evidence and the law defining the element

of 10 years of continuous and uninterrupted use at summary judgment. Before deciding

whether the undisputed evidence supports the PUD's claim for a prescriptive easement,

we must determine what triggers the starting point of the 10-year period based on periodic

use and what degree of periodic use is sufficient to be continuous and uninterrupted. We

consider the history and evolution of prescriptive easements to answer these questions.

First, however, we define a few terms for purposes of consistency throughout this

opinion. "Seasonal use" is the use of property on an annual basis, but only for a portion

of the year. As will be seen below, the term is often used in agricultural property and

property owned for recreational purposes. "Intermittent use" is the infrequent use of

property, usually on an as-needed basis with less regularity than seasonal use. This term

is often used in easements involving road access to remote properties and flooding cases

28

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

where climatological conditions may reduce or eliminate the dominant estate's need or ability to flood the servient estate from year to year. "Changing use" is a form of tacking where one type or degree of use over a portion of the prescriptive period is followed by another type or degree of use over the remainder of the prescriptive period and which may or may not ripen into a prescriptive easement.

We consider an overview of prescriptive easements through secondary sources to determine the degree of periodic use sufficient to constitute continuous and uninterrupted use. Then we turn to definitive cases in Washington and persuasive cases from other jurisdictions.

(a)  Prescriptive Easements for Seasonal, Intermittent, or Sporadic Use

According to Professor Stoebuck:[13]

> [T]he governing principle is that the usage or possession must be as continuous, and no more so, as would be normal if the adverse claimant had a rightful easement or rightful possession. With an easement, this means certainly that the use must be repeated over the period of the statute of limitations, but it does not mean that the use has to be made daily or on any particular schedule.

17 WILLIAM B. STOEBUCK AND JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 2.7, at 105 & n.33 (2d ed. 2004).

---

[13] The late Professor Stoebuck was a nationally-recognized expert on American property law and was a principle author and contributing author of many Washington-specific and nationwide articles and treatises on property law. His works have been cited hundreds of times in Washington's case law.

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

This rule, requiring courts to compare facts against a hypothetical "normal" easement holder, makes the court's inquiry highly fact-specific. It also calls on courts to figure out what a "normal" easement holder looks like, and in this case a "normal" holder of an overflow easement. To support his rule statement, Professor Stoebuck relies on a trio of cases: *Downie v. City of Renton*, 167 Wash. 374, 9 P.2d 372 (1932); *Lee v. Lozier*, 88 Wn. App. 176, 945 P.2d 214 (1997); and *Granite Beach Holdings, LLC, v. State*, 103 Wn. App. 186, 11 P.3d 847 (2000). STOEBUCK, at 105.

The PUD and Maslonkas agree with Professor Stoebuck that *Downie* sets forth the rule on continuous and uninterrupted when the use is intermittent. Unfortunately, *Downie*'s rule is as clear as reservoir sediment. *Downie* involved a reservoir that the City of Renton owned and drained once or twice a year to allow for cleaning and maintenance. When drained, the reservoir's water and accumulated sediment would terminate on Downie's property and pollute a pond on the property.

The court noted that for purposes of a prescriptive easement, continuous use is to be distinguished from temporary or occasional acts of trespass. *Downie*, 167 Wash. at 382. While recognizing that intermittent use may ripen into a prescriptive easement, the court suggested that a stricter version of the rule should apply to intermittent use:

> A different rule applies where the use, as here, consists of occasional acts of trespass and cases where water is appropriated during long periods of time and the amount appropriated varies according to the seasons. In the latter class of cases the law seems to be that if the claimant makes use of the water from time to time as his needs require there is a continuity of use.

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

> *A stricter rule applies where the prescriptive right is based upon occasional torts spread over the statutory period.* In the latter class of cases the rule is quite general that isolated cases of trespass, though repeated over a long period of time, do not constitute use so as to support a claim of prescriptive right.

*Id*. at 382-83 (emphasis added). Thus, according to *Downie*, there are two classes of cases. Class one is cases consisting "of occasional acts of trespass." Class two is cases "where water is appropriated during long periods of time and the amount appropriated varies according to the seasons." These classes parallel the descriptions of "intermittent use" and "seasonal use" found in other cases.

While *Downie* did not clearly articulate the stricter rule for intermittent use, its reasoning guides us. *Downie* relied on *Pierce v. Travers*, 97 Mass. 306, 309 (1867). In *Pierce*, the defendants occasionally placed flashboards on their dam for short periods of time in the summer to raise the water level behind the dam. This affected the water level on the plaintiff's property. The *Pierce* court found that this use was not continuous, but rather an occasional tort, "'perhaps not at once resisted only because they were deemed unimportant and did but a trifling injury to the plaintiff.'" *Downie*, 167 Wn.2d at 383 (quoting *Pierce*, 97 Mass. at 309). Ultimately, *Downie* held that periodic flooding for a day or two every year for 20 years was not sufficient to create a prescriptive easement: "The separate acts of draining the reservoir were wholly lacking in continuity," "consist[ing] at most of desultory acts of trespass, of short duration and occurring at widely separated intervals." *Downie*, 167 Wash. at 383.

31

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

While *Downie* raises several questions, the holding helps establish the outer limits of prescriptive use. At a minimum, we know that flooding a neighbor's property one or two days per year is not enough. *See also Granite Beach*, 103 Wn. App. 186 (sporadic use of logging road to access landlocked property failed to establish continuous and uninterrupted use).

*Lee v. Lozier*[14] concerns seasonal use instead of intermittent use. In *Lee*, a dock was built off a community beach and extended onto Lozier's lot. The neighbor's collectively paid for half of the dock and Lozier's predecessor paid the other half. From the beginning, Lozier's predecessor permitted the community to use the entire dock, although the two boat slips on the Lozier lot were intended to be used exclusively by the lot owner. When Lozier acquired the property, he attempted to assert his property rights. The neighbors sued to obtain a prescriptive easement. Lozier defended on the grounds that "the neighbors' uses of the dock were sporadic and seasonal, taking place mostly during the summer months and on the weekends." *Lee*, 88 Wn. App. at 185.

Relying on Washington's adverse possession case law, the Court of Appeals held: "'Continuous and uninterrupted use' does not, however, require the neighbors to prove constant use of the dock. Instead, 'the claimant need only demonstrate use of the same character that a true owner might make of the property considering its nature and

---

[14] 88 Wn. App. 176, 945 P.2d 214 (1997).

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

location.'"  *Id.*  (citations and internal quotation marks omitted).  In affirming the trial court's grant of a prescriptive easement, the court noted that the neighbors used the dock for recreation just as a true owner would.  Although the dock was only used during the warm-weather months, that use was also consistent with others' dock usage on Lake Washington.  *Id.* at 185-86.  Like *Downie*, *Lee* contains no guidance on how much use is sufficient to be seasonal versus intermittent.

Looking at the current *Restatement of Property*, it too supports Professor Stoebuck's rule statement and suggests that intermittent use ripening into a prescriptive easement may have broader application than what *Downie* suggests.[15]  According to the current *Restatement*: "Seasonal uses, intermittent uses, and changing uses all may meet the continuity requirement so long as they are open or notorious," and "consistent with the character or use of the dominant and servient estates or [consistent] with the normal

---

[15] While the *Restatement* is not binding, it is persuasive.  Secondary authorities are particularly persuasive in this area, as evidenced by Washington's *frequent* reliance on secondary authorities to help it decide easement cases.  In *Lee*, 88 Wn. App. 176, the Court of Appeals relied on the prior version of the *Restatement*.  In *Downie*, 167 Wash. 374, the Supreme Court relied on *Corpus Juris*, *Ruling Case Law*, and *Cyclopedia of Law and Procedure*.  In *Washburn v. Esser*, 9 Wn. App. 169, 172, 511 P.2d 1387 (1973), the Court of Appeals relied on Thompson's Real Property, the prior *Restatement*, *Corpus Juris Secundum*, and *American Law Reports*.  In *Northwest Cities Gas Co. v. Western Fuel Co*, 13 Wn.2d 5, 83, 123 P.2d 771 (1942), the Supreme Court relied on Herbert Thorndike Tiffany's *The Law of Real Property* (3d ed.), *American Jurisprudence*, *Corpus Juris Secundum*, and Clesson S. Kinney's *A Treatise on the Law of Irrigation and Water Rights* (2d ed.).

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

use that would be made of a servitude of the type claimed." RESTATEMENT (THIRD) OF

PROPERTY: SERVITUDES § 2.17 cmt. h. (Am. Law Inst. 2000).

The PUD relies on comment i in its brief. The Maslonkas urge this court to ignore

comment i because no Washington case has adopted it and because it is "inconsistent

with . . . *Granite Beach* and *Downie*." Appellant's Reply Br. at 10. Contrary to the

Maslonkas' position, the rule statement is consistent with the rules set down in *Downie*,

*Granite Beach*, and the rest of the Washington cases discussed below.[16]

For seasonal use (not intermittent use), the *Restatement* provides the following

examples of cases where seasonal use ripened into a prescriptive easement: *Ellison v.*

*Fellows*, 121 N.H. 978, 981, 437 A.2d 278 (1981) (annual use of road for hauling hay

during the haying season sufficient because "characteristic of the kind of road claimed");

*Epstein v. Rose*, 101 A.D.2d 646, 475 N.Y.S.2d 556 (1984) (seasonal use of road to reach

wood lot about 100 times per year to remove wood and hunt met continuous

requirement); *Perry v. Williams*, 84 N.C. App. 527, 530, 353 S.E.2d 226 (1987) (annual

use of road by farm equipment "at all hours of the day during the farming season" was

continuous); *Smith v. Mervis*, 38 Ill. App. 3d 731, 733, 348 N.E.2d 463 (1976) (use of

---

[16] We limit our application of comment i to the *Restatement*'s discussion of what it calls the "physical aspect" of the continuous and uninterrupted use element, particularly its discussion of seasonal and intermittent uses. We do not adopt the *Restatement*'s discussion of what it calls the "mental aspect" of this element.

34

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

railroad right-of-way parallel to tracks 100 times per year for 27 years for moving

farming equipment sufficiently continuous). *See* RESTATEMENT, § 2.17 cmt. i.

These cases suggest that use may be considered "seasonal" and not "intermittent"

if the use is tied to a recurring, predictable time of year (e.g., a particular growing season)

even if the use is not daily during that season, or where use is so frequent that it occurs

daily over several months of the year. On summary judgment, the PUD asserted that the

dam caused excess flooding on the Maslonkas' property on average of 22 non-

consecutive days per year, usually (though not always) in the spring, but unpredictable

nonetheless. This position suggests intermittent as opposed to seasonal use because it

lacks the same seasonal character as an established growing season, a known hunting

season, or the summer vacation season.

  (b) <u>Additional Washington Cases Applying the Rule on Continuous and
Uninterrupted Use</u>

In addition to establishing that periodic use is sufficient to be continuous and

uninterrupted, the PUD must also establish the actions that trigger the prescriptive period,

the boundaries of the prescriptive easement, and the reasonable use of the easement.

"The seminal case on prescriptive easements is *Northwest Cities*." *Gamboa*, 183

Wn.2d at 43. Northwest Cities filed suit against Western Fuel, seeking a prescriptive

easement to use a road across Western Fuel's property. The suit was prompted when

Northwest Cities expanded its use of Western Fuel's property and Western Fuel closed

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

off Northwest's access. The evidence easily supported the element of 10 years of continuous and uninterrupted use by Northwest Cities. *Nw. Cities Gas Co.*, 13 Wn.2d 75.

The issue relevant to this case was changing use and the extent of the resulting easement. The plaintiff's present use of the servient estate extended to 48 feet in width, but their historical use was only 20 feet in width. Because the plaintiff could only prove 10 years of continuous use at 20 feet in width, the Supreme Court held that the trial court erred in defining the easement based on the current use. *Id*. at 91-93. Relying on *Corpus Juris Secundum*, the Supreme Court held:

> "Where an easement is acquired by prescription, the extent of the right is fixed and determined by the user in which it originated, or, as it is sometimes expressed, by the claim of the party using the easement and the acquiescence of the owner of the servient tenement. While a prescriptive right to an *extended* easement may be acquired by excessive user . . . yet an easement acquired by prescription cannot be *extended* except by an adverse user which has been acquiesced in for the requisite length of time, or by the acquisition by some other title of additional rights."

*Id*. at 92 (alteration in original) (quoting 28 C.J.S. *Easements* § 74, at 751 (1941)).

The import of this case is that for the PUD to establish its prescriptive easement up to 2041 feet, it needed to demonstrate that it had operated the dam at that level throughout an entire prescriptive period. The record contains no evidence showing that the PUD has operated the dam at this level for 10 consecutive years.

We know that in 1999, FERC amended the PUD's license to approve the Tribe's settlement to permit operations to continue up to 2041 feet on Tribal land. But, this

36

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

license amendment does not state when the PUD started operating up to that level or whether that operation has been continuous. The fact that the river has reached or exceeded 2041 feet every year of the dam's existence, except for 5 years, is insufficient to support summary judgment on the PUD's claim. Without additional information, we have no way of knowing if that rise in elevation was caused by nature or caused by the dam. It could be that the dam's historical practice has been to lift all the gates at 2031 or 2041 feet or somewhere in between. If the dam's historical practice has been to lift the gates prior to 2041 feet, then under *Northwest Cities*, the trial court would have had to set the easement to that lesser level, assuming that historical practice had persisted for 10 consecutive years. The record contains no evidence of the dam's actual historical practices for any 10 year period; although, the PUD's CR 30(b)(6) designee could probably immuniate this issue on remand.

The parties also rely on *McInnis*. In *McInnis*, the Supreme Court considered a prescriptive easement in favor of a dam operator to flood surrounding lands. The dam was a reservoir dam, creating a storage pond for logs floated down the river to a sawmill. The evidence established that the dam presently raised waters in the area immediately above the dam by more than 29 inches and had for some years. But, the dam operator could only prove 10 years of continuous use at an elevation of 29 inches. Because the dam operator could not prove 10 years of use at an elevation greater than 29 inches, the Supreme Court affirmed the trial court's setting of the prescriptive easement at 29 inches

37

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

and not at a higher level. *McInnis v. Day Lumber Co.*, 102 Wash. 38, 39-40, 172 P. 844 (1918).

The import of *McInnis* is the same as *Northwest Cities* and is highly analogous to this case, given that it involved an overflow easement. For the PUD to acquire a prescriptive easement up to 2041 feet, it needs evidence of 10 years of continuous and uninterrupted use at—not up to—2041 feet for each of those 10 years. If most of the PUD's use during any given year occurs below 2041 feet, reaching 2041 only a few days a year, then any easement will be at the highest *continuous* level of use.

One of the relevant cases that the parties did not cite is *St. Martin* which helps us determine when a prescriptive period begins to run. St. Martin built a resort around a natural hot spring. In 1901, Skamania Boom Company built a splash dam[17] on a seemingly unconnected nearby river. "For some unknown reason, the flow of the spring is so affected by the volume of water in the river that, when the flow of the river is obstructed above the spring in the dry summer season, the spring furnishes only a small part of its normal supply, and is wholly insufficient to accommodate the plaintiffs' guests and patrons." *St. Martin v. Skamania Boom Co.*, 79 Wash. 393, 395, 140 P. 355 (1914).

---

[17] Splash dams were used by logging companies to float logs to downstream sawmills. If a waterway's flow was insufficient to carry logs to the mill, the loggers would construct a splash dam to impound upstream waters and when enough water built up behind the dam, the loggers would release it, and the surging backflow would carry the logs to the sawmill. *See Berryman v. E. Hoquiam Boom & Logging Co.*, 68 Wash. 657, 658, 124 P. 130 (1912).

38

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

St. Martin sued to either enjoin the splash dam's operation or force the owners to reconstruct it downriver from the spring. The dam owner countered that it had acquired a prescriptive easement because the dam had been in operation for approximately 12 years prior to St. Martin commencing suit.

The Supreme Court affirmed the trial court, and held that the dam operator had not acquired a prescriptive easement. Although the dam had been in operation for over a decade, it had been less than ten years since the dam's operations first damaged St. Martin's spring. The damage did not begin until some years later when other dams along the same river system (also built by Skamania Boom) came into operation, blocking off alternative routes for the river's waters to reach the spring—a change in use. In siding with St. Martin, the Supreme Court held: "We think that, both on reason and authority, the period of a prescriptive right to an easement to use or damage the lands of another can only begin to run from the time when the person suffering the damage first had a cause of action arising from the adverse use." *St. Martin*, 79 Wash. at 399.

Similar to *Northwest Cities* and *McInnis*, *St. Martin* confirms that for the PUD to have acquired a prescriptive easement to flood above the level of its express easement, we must know when the PUD first began violating the terms of its express easement, in other words: when it began causing damage above 2035.5 feet.

*Murphy* answers the same question answered in *St. Martin*, concerning when the prescriptive period begins to run. Like this case, *Murphy* also involved a dam owner's

39

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

prescriptive easement to flood neighboring property. *Murphy v. Calispel Duck Club*, 163

Wash. 366, 300 P. 1060 (1931). In 1907, the Club built a dam on the Calispel River in

Pend Oreille County. The dam functioned for over a decade without causing any

problems for Murphy. In 1926, the Club elevated the dam several feet, which flooded

roughly 120 acres of Murphy's farmland. Murphy filed suit less than five years later.

The Club counter-claimed that it had acquired a prescriptive easement to flood Murphy's

property because the dam had been in continuous operation for well over a decade.

Murphy countered that the prescriptive period did not begin to run until 1926 when the

modification to the dam caused the first actual damage to his property. Quoting from *St.*

*Martin*, the Supreme Court sided with Murphy and held that the prescriptive period did

not begin to run until 1926; thus, the Club had not acquired a prescriptive easement.

*Murphy*, 163 Wash. at 367-68 (quoting *St. Martin*, 79 Wash. at 399). *Murphy* and *St.*

*Martin* confirm that the first step in deciding whether the PUD has a prescriptive

easement is answering when the prescriptive period began to run, as defined by the date

the PUD began exceeding its express easement to such a degree that a cause of action

accrued. The fact that the original FERC license capped operations at 2041 feet does not

tell the court how often the PUD in fact went up to that limit during any given 10-year

period.

Finally, assuming the PUD can establish a prescriptive easement to flood the

Maslonkas' property up to 2041 feet, there is a question of fact as to whether and to what

40

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

extent the prescriptive easement allows the PUD to damage the Maslonkas' property. In

*Berryman v. E. Hoquiam Boom & Logging Co.*, 68 Wash. 657, 659, 124 P. 130 (1912),

the defendants operated a splash dam that would flood the plaintiffs' property when

waters were released to float logs down the river. The undisputed evidence established

that this flooding had occurred for more than 10 years under a claim of right, and the

defendants had a prescriptive easement to do so. Nevertheless, while the easement itself

was clearly established, the plaintiffs could still recover damages if the easement had

been negligently used or unreasonably damaged the plaintiffs' property. *Id*. at 660.

In this case, the Maslonkas contend that even if the PUD establishes a prescriptive

easement, the easement does not allow the PUD to erode their property permanently. The

PUD contends that its prescriptive easement is the same as its express easement, allowing

for erosion. As the court in *Northwest Cities* noted, the terms of a prescriptive easement

are set by the use established over the prescriptive period. The terms and boundaries of a

prescriptive easement are questions of fact, as is whether the easement has been

negligently used or unreasonably damaged the Maslonkas' property.

        (c)   Foreign Cases

Our review of out-of-state cases supports our understanding that Washington law

on prescriptive easements is in accord with most states.

41

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

The PUD cites *Swan*[18] and *Arrien*[19] in support of its position. *Swan* concerns

seasonal flooding and has been cited by our Supreme Court several times. In *Swan*, five

upriver property owners sued Munch, the owner of a dam, for flooding their property.

The Minnesota Supreme Court described the dam as a "sluicing dam," used for driving

logs downriver. *Swan v. Munch*, 65 Minn. at 501, 503. Munch defended on the grounds

that she had acquired a prescriptive easement to flood the plaintiffs' properties. The

plaintiffs argued she failed to prove continuity because she only flooded their lands from

April–June (the runoff season). The court held that such seasonal use did not disrupt

continuity because Munch used the plaintiffs' property "only when her needs and public

necessity requires her to do so . . . and an omission to use it when not needed would not

disprove a continuity of use, or defeat her right to an easement by prescription." *Id.* at

503. The court also noted that it is common knowledge that log-driving typically only

occurs during those months, and that it is not profitable during other months of the year.

*Id.*

Swan supports the PUD's position that seasonal flooding on an as-needed basis

will support a finding of continuous and uninterrupted use. *Swan* fits well within the rule

adopted in *Lee* and *Howard* (Washington's seasonal use cases). But, it is not at all clear

that the "run of the river" dam in this case is in any way comparable to the "sluicing

---

[18] *Swan v. Munch*, 65 Minn. 500, 67 N.W. 1022 (1896).
[19] *Arrien v. Levanger*, 263 Or. 363, 502 P.2d 573 (1972).

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

dam" from *Swan*. The facts in *Swan* suggest that while the flooding only occurred for three months of the year, it was continuous during those three months. More importantly, the facts in *Swan* were determined after a trial, not at summary judgment.

Here, the evidence shows that the PUD has for decades caused flooding an average of 22 days per year. This is certainly more than the once or twice per year at issue in *Downie*, but it is also far less than the constant use throughout the spring or summer months that the old log driving dams were known for. It is also not clear how many consecutive days of flooding above 2035.5 feet was generally caused by Box Canyon Dam. It may be that the Maslonkas' property was flooded for a week or month at a time, but only one or two days was caused by the dam.

The PUD also cites *Arrien* that concerned seasonal damage to farmland caused by a reservoir dam. The defendant had a permit from the state to impound approximately 1000 acre feet of water, but actually impounded far more than that in order to maximize water availability for irrigation; the excess impoundment resulted in flooding on the plaintiff's land. The defendant claimed a prescriptive easement up to the dam's high water mark during "wet" years. The plaintiff countered that continuity had not been established because there were several years during the claimed prescriptive period in which the water never reached that level, and several other years where the dam caused no flooding at all. *Arrien*, 263 Or. at 367-68.

43

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

The Oregon Supreme Court sided with the defendant dam, but did so under reasoning that is incompatible with Washington's case law. While the court's holding confirmed that intermittent use can ripen into a prescriptive easement, the court went on to hold that the boundaries of the easement were established by the dam's high water mark, which was reached in only one-third of the years that flooded. *Id.* at 369-70. This holding is clearly contrary to the precedent established in *McInnis* and *Northwest Cities*, which limited prescriptive easements to their maximum sustained use over the prescriptive period. It is also contrary to trend in other states discussed below, and appears to be an outlier among the states.

The Maslonkas rely on several Idaho cases to support their position that PUD has failed to establish a prescriptive easement. These cases are easily distinguishable because Idaho's common law provided that flooding caused a continuing trespass under tort law that could never ripen into a prescriptive easement. *See Deffenbaugh v. Wash W. Power Co.*, 24 Idaho 514, 135 P. 247 (1913), and *Lavin v. Panhandle Lumber Co.*, 51 Idaho 1, 1 P.2d 186 (1931). This rule effectively prohibited dam operators like the PUD from ever acquiring prescriptive rights in Idaho. Not only is this a minority position in the United States and incompatible with Washington law, but Idaho enacted a statute abrogating this common law rule. *See* FORMER IDAHO CODE § 5-246 (1991).

One of the more analogous foreign cases that was not identified by the parties is *Blasdel v. Montana Power Co*., 196 Mont. 417, 640 P.2d 889 (1982). In *Blasdel*, a

44

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

farmer successfully brought suit for inverse condemnation stemming from damage

caused by Kerr Dam.[20]  The dam impounds the waters of the Flathead River, raising the

natural levels of Flathead Lake, and uses the lake as its reservoir.  Because Seli'š Ksanka

Qlispe' Dam is an impound dam, not a ROR dam, it affects upstream lands differently

than Box Canyon Dam.  Instead of increasing the frequency and intensity of periodic

flooding (like Box), Seli'š Ksanka Qlispe' raises the surrounding water table,

permanently submerging low-lying lands and enlarging existing sloughs.  While the

plaintiffs began complaining of damage to their land in 1941, there were no problems

during dry years.  Following a bench trial, the court found that the problems caused by

the gradually increasing water table were intermittent and temporary until 1959-1960,

when they became permanent.  Thus, the statute of limitations on the plaintiff's claim of

inverse condemnation did not begin to run until the damage became permanent.

Throughout trial, Montana Power continued to assert that it never invaded the

plaintiff's property.  It appears that Montana Power raised the defense of prescription for

the first time on appeal.  The Montana Supreme Court rejected this defense, concluding

that Montana Power failed to prove any of the elements of a prescriptive easement at

trial.

The facts in *Blasdel* are analogous to this case.  Here, the PUD submits that its

evidence shows that the dam has historically caused an average of 22 days annually of

---

[20] Kerr Dam was renamed Seli'š Ksanka Qlispe' Dam in 2015.

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

flooding above its express easement limits. And yet, the PUD does not submit evidence to show any particular day when the dam has caused any excess flooding. Instead, the PUD argues that its evidence of averages since the dam became operational in 1955 is sufficient to show a prescriptive easement. Under *Blasdel* (and more importantly *McInnis* and *Northwest Cities*), the dam operator as the party with the burden of proof must specifically identify when it believes the prescriptive period began to run—i.e., identify the specific year when it first caused damage to the plaintiff's land sufficient to put the landowner on notice—and then put forward competent evidence for each subsequent year showing that it (and not natural meteorological conditions) continued to so damage the plaintiff's land. While interruptions in use will not necessarily prevent the establishment of an easement, such interruptions may impact any easement's defined limits.

In *Steiner v. County of Marshall*, the South Dakota Supreme Court held that the prescriptive period for a flooding easement did not begin to run until the first damage occurred. 1997 S.D. 109, 568 N.W.2d 627, 632 (1997). *Steiner* is a relatively recent case that offers persuasive authority to reinforce the ongoing validity of Washington's older cases holding that the prescriptive period does not begin to run until damage occurs, not when the damage becomes a possibility.

In *Buchanan v. Seim*, 104 Neb. 444, 177 N.W. 751, 752 (1920), the defendant built an embankment on his property to hold back flood waters from an adjacent creek.

46

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

When the creek flooded, the embankment caused the plaintiff's property to flood. The plaintiff sued to remove the embankment and the defendant claimed a prescriptive easement to flood his neighbor's property. While acknowledging that the flooding had occurred for more than 10 years, it was at "intermittent and widely separated intervals" that were insufficient to constitute continuous use sufficient to perfect an easement by prescription. *Id*.

*Stricker v. Knaub* is a case of changing use. Stricker and Knaub were farmers. Knaub's excess irrigation water collected on Stricker's property. Stricker sought to force Knaub to recapture his excess irrigation water, and Knaub claimed a prescriptive easement to flood Stricker's property. 215 Neb. 372, 338 N.W.2d 757 (1983). Nebraska's Supreme Court rejected the easement because the evidence failed to establish the constant minimum level of use over the prescriptive period:

> "The nature and extent or scope of the user must from the beginning be clearly established. At the end of the period it must appear in retrospect that there has been no material change or variance from the limits or course adopted or established at the beginning. A lesser user prevents a right to an easement and a greater user is of no importance until the full prescriptive period has elapsed from the initiation of the greater use. The law requires that the easement must be clearly definable and precisely measured." We conclude the evidence fails to clearly, convincingly, and satisfactorily show all of the elements required to establish a prescriptive easement such as sought by defendants.

*Id*. at 377-78 (quoting *Kuhlmann v. Platte Valley Irrigation Dist*., 166 Neb. 493, 89 N.W.2d 768, 781 (1958) (citations omitted)). While Knaub had discharged water onto

47

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

Stricker's property for decades, the use kept changing. The discharge did not always pool in the same area of Stricker's property and occurred at different times of the year depending on what crop was in rotation. Moreover, the discharge had only become a problem in recent years when Knaub drilled more wells, allowing him to continue irrigating after the irrigation district had discontinued supplying water, and because Knaub's switch to nitrate fertilizers required more water.

Continuing, the court further explained: "The volume of waste water discharged has varied from year to year. Consequently, the nature and extent or scope of the user over any one 10-year period cannot be determined. Stated another way, the evidence fails to establish by the requisite quantum of evidence the lesser user enjoyed by defendants during any 10-year period." *Id*. at 378. While Knaub probably could have acquired a lesser easement, he acquired no easement at all because he could not prove a minimum level of sustained use over any 10-year period.

Under the facts presently before this court, *Stricker* is instructive and consistent with Washington State's *McInnis* and *Northwest Cities*. It is possible that the PUD has been causing excess flooding on the Maslonkas' property for decades. But, the PUD has not pointed to a single 10-year period that it claims to have damaged the property in a continuous and uninterrupted manner sufficient to give rise to a prescriptive easement. Nor has it shown that its use has remained continuous at a particular level for the

48

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

prescriptive period sufficient for a finder of fact to set the boundaries of any prescriptive

easement.

Another fact worth noting is that the PUD's answer to the complaint alleged that

its prescriptive easement vested "in or about 1965." CP at 31. Yet, 1955-1965 was not

the prescriptive period that the PUD argued at summary judgment. At summary

judgment, the PUD alleged that the easement vested in July 1966 (10 years after starting

operations) or February 2009 (10 years after the 1999 license amendment). In granting

summary judgment, the trial court found that the prescriptive easement vested "no later

than 1999" (yielding a prescriptive period of 1989-1999), but did not explain how it

reached that conclusion. The Maslonkas do not appear to have realized this discrepancy

in the pleadings and have thus waived any claim of error with respect to lack of notice.

However, the PUD's failure to specify an exact prescriptive period at summary judgment

supports the Maslonkas' claim that genuine issues of material fact exist with respect to

this issue.

(d)    Application of the Facts to the Law

As this exhaustive review of cases demonstrate, there is no magic number that

distinguishes intermittent use from seasonal use or sporadic use. Nor is there a definitive

legal test to determine when intermittent or seasonal use is sufficient to ripen into a

prescriptive right. Instead, the answers to these critical questions are highly fact specific.

On summary judgment, the PUD failed to meet its burden of showing that no genuine

49

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

issues of material fact exist as to (1) when the 10-year period prescriptive period began, (2) that its use during that period was more than an occasional tort, and (3) that it consistently caused flooding at 2041 feet sufficient to establish that elevation as the boundary of the alleged easement.

The Washington State Supreme Court was clear in *St. Martin* and *Murphy* that the prescriptive period does not begin to run whenever a dam is built, thereby creating the risk of flooding. The prescriptive period only begins to run when the dam's operations actually causes continuous harm, giving rise to a cause of action for damages.

The use must be continuous enough that it is more than an occasional tort. As Mr. Maslonka noted, when the water is high for a day or two, it has little impact, but, when the water is high for a month or two it has a substantial negative impact on Mr. Maslonka's farming operations. If this is true, the fact-finder may determine that infrequent flooding for a day or two does not cause damage (*Blasdel*) or is insufficient to be continuous (*Downie*). Throughout summary judgment, the PUD has claimed that on average, the dam causes flooding to the Maslonkas' property 22 days per year. But this "average" is based on 40 years of data that varies widely as demonstrated by the detailed analysis of data between the years of 2015 and 2018. The reliance on vague averages without any definite evidence of continuous trespass fails to clearly establish the element of continuous use as a matter of law capable of resolution on summary judgment.

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

Not only does the PUD's evidence fail to provide any certainty on when it first began damaging the Maslonkas' property, and how many days the dam has caused flooding on the Maslonkas' property during a 10-year period, but there is no evidence as to the extent of the flooding. Again, the question is not whether the Maslonkas' property has flooded, it is whether the flooding was caused by the dam and to what extent and over what period of time. Instead, the PUD argues that the dam has been in existence since 1955 and the water has exceeded the easement. Under *Northwest Cities* (what *Gamboa* called Washington's "seminal case on prescriptive easements"), a prescriptive easement is not defined by the highest one-time level of use during the prescriptive period; rather, it is based on the highest level of use sustained over the prescriptive period. Thus, the Supreme Court in *Northwest Cities* reduced the prescriptive easement from 48 feet in width down to 20 feet. *See also McInnis*, 102 Wash. 38 (overflow easement set at 29 inches even though current use exceeded 29 inches).

C. INVERSE CONDEMNATION

  1. *Subsequent Purchaser Rule*

In their complaint, the Maslonkas included a claim for inverse condemnation, alleging that the PUD's actions of flooding their property above the express easement constituted a permanent taking. The superior court dismissed this claim on summary judgment after determining that the subsequent purchaser rule barred the claim for inverse

51

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

condemnation. The Maslonkas assign error to this decision. We conclude that the PUD

failed to meet its burden of proving the subsequent purchaser rule as a matter of law.

Inverse condemnation occurs when private property is taken or permanently

reduced in value by a government agency for public use without formal exercise of the

government's right of eminent domain. *Phillips v. King County*, 136 Wn.2d 946, 957,

968 P.2d 871 (1998). The PUD contends that even if its flooding of the Maslonka's

property constitutes a taking, this taking occurred before the Maslonkas purchased their

property. Damages owed, if any, would have been payable to the Maslonkas'

predecessors, but not the Maslonkas.

"Because the right to damages for an injury to property is a personal right

belonging to the property owner, the right does not pass to a subsequent purchaser unless

expressly conveyed." *Hoover v. Pierce County*, 79 Wn. App. 427, 433-34, 903 P.2d 464

(1995). Accordingly, "a grantee or purchaser cannot sue for a taking or injury occurring

prior to his acquisition of title, but he may sue for any new taking or injury." *State v.*

*Sherrill*, 13 Wn. App. 250, 257 n.1, 534 P.2d 598 (1975). Thus, the determinative

question is whether the PUD's excess use constituted a permanent taking and if so, when

the taking was completed. *See Hoover*, 79 Wn. App. at 434 ("Thus, the determinative

question in this case is whether the floodings which occurred in 1990 and 1991, after the

Hoovers purchased the property, gave rise to new causes of action.").

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

Because the subsequent purchaser rule is a defense, it was the PUD's burden before the superior court to prove that it permanently reduced the value of the Maslonkas' property before the Maslonkas purchased the land in 1993. The PUD failed to carry this burden on summary judgment. The PUD's primary evidence in support of the subsequent purchaser rule is Mr. Maslonka's deposition testimony admitting that he knew prior to purchasing it that the property flooded periodically. But this testimony is too nonspecific to prove anything. Mr. Maslonka was not asked at what water mark he knew the property flooded to and was not asked if he knew the source of the flooding. The inverse condemnation claim is based on flooding above the express easement limit, and without deposition testimony tailored to distinguishing between flooding above or below the easement limit, the PUD cannot prove its defense as a matter of law. In other words, when taking the evidence in the light most favorable to the Maslonkas, Mr. Maslonka's deposition testimony only proves that he was aware of periodic flooding up to the recorded easement limits. Thus, a genuine issue of material fact exists precluding summary judgment on this defense.

In addition to Mr. Maslonka's testimony, the PUD also relies on the fact that the dam has been in constant operation since before the Maslonkas purchased their property. This fact is also meaningless when presented on its own. In order to receive the benefit of the subsequent purchaser rule, the PUD must show that its operations began causing damage above 2035.5 feet prior to 1993.

53

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

Moreover, "[a] new taking cause of action accrues with each measurable or provable decline in market value of the property." *Hoover*, 79 Wn. App. at 434 (citing *Highline Sch. Dist. 401 v. Port of Seattle*, 87 Wn.2d 6, 15, 548 P.2d 1085 (1976)). Thus, if the PUD can only prove that it caused flooding up to for example 2037 feet (instead of 2041) prior to 1993, then the Maslonkas will still have a new takings cause of action for damage above 2037 feet.

In addition to elevation, there is also a question of degree. Flooding another's property once or twice a year might be relevant to proving the prescriptive easement claim, but it has little bearing on application of the subsequent purchaser rule. Flooding once or twice a year is unlikely to have any damaging effect on much of the Maslonkas' property. The distinction between mere excess use and excess use that results in damages is important because a taking only occurs when injury occurs. *See Blasdel*, 196 Mont. 417.

We also note that the PUD has received significant license amendments at least twice since the Maslonkas purchased the property. It is not inconceivable to think that the PUD altered or expanded its operations as a result of those amendments in such a way as to cause new damage to the Maslonkas' property.

While the Maslonkas are ultimately responsible for proving new damage during their tenure, it is the PUD's burden to prove damage prior to the Maslonkas' tenure if the PUD is to receive the benefit of the subsequent purchaser rule. The current record is

54

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

insufficient to make these determinations. Accordingly, the dismissal of inverse condemnation claims must be reversed.

### 2. *Inverse Condemnation does not Subsume Other Torts*

The PUD also argues that the trespass and nuisance claims should be dismissed because they are subsumed by the inverse condemnation claims. According to the PUD, if the inverse condemnation claims are dismissed then the trespass and nuisance claims must also be dismissed. For support, the PUD relies on two cases: *Ackerman v. Port of Seattle*, 52 Wn.2d 903, 329 P.2d 210 (1958) and *Highline School Dist. No. 401*, 87 Wn.2d at 17, 18.

In *Ackerman*, the Supreme Court stated that when a taking occurs, the government acts in its sovereign capacity and "goes not as a trespasser." *Ackerman*, 52 Wn.2d at 218 (citation omitted). "It is apparent that acts of a municipal corporation or its agents in the prosecution of a public work or use, which, if done by a private individual, would constitute a trespass, *are deemed a constitutional taking or damaging rather than a trespass*." *Id.* at 218-19 (alteration in original). Because the Supreme Court was remanding for a trial on the plaintiff's inverse condemnation claim, it was able to "dispose of the trespass theory briefly and quickly." *Id.* at 218. This opinion appears to suggest that when inverse condemnation is pleaded, then a trespass claim cannot be pleaded and must be dismissed.

55

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

In a subsequent appeal in the same case, the court clarified: "If the complaint is sustainable on the theory of constitutional taking, the trial court's order sustaining the Port's demurrer must be reversed, and any discussion of the common law concepts of trespass or nuisance is unnecessary." *Ackerman*, 55 Wn.2d at 404. This latter opinion suggests that trespass and nuisance are merely mooted when there is a viable cause of action for inverse condemnation, not that they are incompatible with each other. If there had been no viable cause of action for inverse condemnation, then it would have been "necessary" for the court to address those torts. The rule stated in the latter *Ackerman* opinion appears to be more so a rule of judicial economy, than a rule against mutually exclusive causes of action.

In *Highline* (the other case relied on by the PUD), the Supreme Court explained: "In this jurisdiction the evolution of inverse condemnation actions in the airport cases[21] has made reliance on traditional tort theories unnecessary when, as here, the airport is

---

[21] The airport cases were a nationwide movement during the mid-20th century that grew out of the United States Supreme Court's expansion of takings to compensate nuisances (non-trespassory invasions to real-property) for property value lost as a result of noise from aircraft landing and taking off. Traditionally, activity legislatively authorized by government could never be a nuisance because such activity was undertaken for the public good. The airport cases created an exception to this common law defense. *See generally United States v. Causby*, 328 U.S. 256, 66 S. Ct. 1062, 90 L. Ed. 1206 (1946), and its progeny.

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

owned and operated by a governmental entity and the recovery sought is only for loss of

property rights, not personal or other injuries." *Highline*, 87 Wn.2d at 17. Thus,

> In circumstances where the inverse condemnation theory is available,
> potential plaintiffs are not disadvantaged if they are denied recourse to a
> nuisance cause of action. Of course, where a plaintiff seeks to recover
> damages for other than loss of property rights or where the defendant is not
> an entity to which eminent domain principles apply, the nuisance remedy is
> still available.

*Id.* at 17-18 (footnote omitted).

The characterization of "traditional tort theories" as "unnecessary" and that tort

recovery is possible alongside condemnation damages where different types of damages

are sought confirms that the tort causes of action are not fully subsumed by inverse

condemnation. In *Ackerman* and *Highline*, it was only unnecessary to address the torts

because the plaintiffs had viable inverse condemnation claims. Both cases imply that if

the condemnation claims failed, that the tort claims would still exist as backup theories of

recovery.

Notably, subsequent cases of inverse condemnation, have not followed the PUD's

interpretation of *Ackerman* and *Highline*. For example, in *Lakey* the Supreme Court

addressed the merits of the plaintiffs' nuisance claim alongside the merits of their inverse

condemnation claim. *See generally Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909,

296 P.3d 860 (2013). Despite relying on *Highline* as authority, the *Lakey* court did not

mention any rule against pursuing a nuisance action alongside a condemnation action.

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

In *Pacific Highway Park*, an unpublished case relied on by the Maslonkas, Division Two of this court rejected an argument similar to the one raised here by the PUD that inverse condemnation subsumes trespass. *Pac. Hwy. Park v. Dep't of Trans.*, No. 44198-5-II at 6 (Wash. Ct. App. June 3, 2014) (unpublished), www.courts.wa.gov /opinions/pdf/D2%2044198-5-II%20Unpublished%20Opinion.pdf. The court also ruled that even if inverse trespass could subsume trespass, that dismissal of the trespass claim was not appropriate because there was no inverse condemnation claim to subsume it into because of application of the subsequent purchaser rule. *Id.*

In this case, the trial court erred by dismissing the inverse condemnation claims under the subsequent purchaser rule. The evidence submitted by the PUD is insufficient to prove as a matter of law that any and all takings occurred prior to the Maslonkas' purchase in 1993.

D. PARCEL ONE CAUSES OF ACTION

The PUD argues that if we reverse dismissal of the Maslonkas' claims, we should affirm dismissal of those claims related to Parcel 1 (inland parcel) on the alternative ground that the Maslonkas failed to make out a prima facie claim that the PUD proximately caused injury to Parcel 1. We agree with the PUD's argument.

Although the trial court did not reach this argument, this court may affirm the trial court on any ground supported by the record. RAP 2.5(a). "Summary judgment . . . may be brought in one of two ways. The defendant can attempt to establish through affidavits

58

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

that no material factual issue exists or, alternatively, the defendant can inform the trial

court that the plaintiff lacks competent evidence to support an essential element of her

case.  In this latter situation, the moving party need not support its summary judgment

motion with affidavits."  *Boyer v. Morimoto*, 10 Wn. App. 2d 506, 519, 449 P.3d 285

(2019) (citations omitted).  Here, the PUD has established both: no genuine issue of

material fact exists as to Parcel 1 and that the Maslonkas lack competent evidence to

support an essential element of each of their Parcel 1 causes of action.

The Maslonkas claim that liability for damage to Parcel 1 stems from the PUD's

failure to maintain the diking improvements at Perkins Slough, but their analysis never

moves beyond conclusory allegations.  In his deposition, Mr. Maslonka was clear that he

could only offer speculation on the cause of the flooding on Parcel 1:

> I have really no opinion on whose—whose responsibility it is.  I don't
> know what's actually causing the problem.  I don't know if it's the culvert
> where the gate and culvert meet, or the gate itself.  I can't specify.  I really
> have no opinion on whose responsibility it is or where the damage, leaks
> are coming from.

CP at 175.  The Maslonkas' expert also did not opine on what caused the flooding on

Parcel 1.

To support their position on appeal, the Maslonkas offer a string of citations to the

clerk's papers, but conspicuously fail to analyze the parts of the record they cite to.

Appellant's Reply Br. at 24 (citing CP 1353-55, 1363, 1366, 1368, 1370, 1372, 1374-

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

1379, 1390, 1396). A review of these citations shows that they do not support the

Maslonkas' position.

The only evidence as to what might be causing the flooding on Parcel 1 came from

evidence supplied by the PUD during discovery. The PUD's employees determined at

least as far back as 2006 that the culvert was leaking water out through the dike and that

the dike itself had several leaks, but that the gate was intact. A 2016 report by

engineering firm McMillen Jacobs, commissioned by the PUD, revealed significant

corrosion in the culvert. Distinguishing amongst the dike, culvert, and gate is important

because different contracts delineate who is responsible for each of these structures.

In 1963, and again in 2008, the PUD signed contracts with the Diking District

obligating the PUD to operate and maintain the gate and pump. Neither contract contains

an agreement to maintain the culvert or the dike (i.e., railroad embankment). The 2008

contract expressly disclaimed any PUD responsibility for "replacement or repair to the

culvert." CP at 324. Considering that Mr. Maslonka was a signatory to that 2008

contract (in his capacity as Diking District Commissioner), it would be disingenuous for

him to now argue that the contract obligated the PUD to assume legal responsibility for

the culvert. Instead, the Maslonkas ignore the contracts altogether.

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

The only evidence in the record concerning a responsibility to maintain the culvert and dike (as opposed to the gate) is in the railroad's 1909 contract with the Diking District. This contract gave the Diking District a license to use the railroad embankment as a dike. It also gave the Diking District permission to operate flood gates at the ends of the culvert, with the gates to be constructed by the railroad at the Diking District's expense. Finally, the contract allocated responsibility for maintenance and improvement of the culvert: requiring the railroad to pay for any changes intended to benefit the railroad and for the Diking District to pay for any changes intended to benefit the Diking District.

When considering the contracts and the Maslonkas' citations to the record as a whole, the record supports a finding that the culvert and dike are defective and that the same cannot be said of the gate. The record supports a finding that the PUD is legally responsible for the gate, but not the defective culvert and dike. While the record shows that in 2006/2007 the PUD participated in discussions to replace the culvert, those discussions were instigated by a request from Mr. Maslonka and also included the Port and Diking District. Furthermore, the 2008 contract with the Diking District expressly disclaims any legal duty by the PUD to maintain or replace the culvert. Thus, as to Parcel 1, the record potentially supported a prima facie case against the Port (as the railroad's successor in interest), but not the PUD.

61

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

At oral argument, the Maslonkas' counsel suggested that the PUD is legally responsible for the flooding to Parcel 1 simply because Box Canyon elevates the river above its natural high water mark. But, the Maslonkas' first amended complaint only alleges that it is the failure of the diking improvements that causes the flooding to Parcel 1. The complaint does not allege that the PUD has any fault for flooding Parcel 1 independent of any duty it has to maintain the diking improvements. Because we affirm dismissal of all claims pertaining to Parcel 1 on the alternative ground of failure to present a genuine issue of material fact as to duty and causation, we do not address the trial court's orders dismissing the tort and taking claims against Parcel 1 under various defenses.

### E.  CLAIM OF NEGLIGENCE—PARCEL 2

The final cause of action dismissed by the trial court was the Maslonkas' claim of negligence related to Parcel 2. The trial court initially denied the PUD's motion to dismiss the trespass, nuisance, and negligence claims under the statute of limitations. On reconsideration, the court granted the motion for summary judgment as to the negligence claim on Parcel 2 only, but did not specify that it was doing so on statute of limitations grounds. This court can infer that the court granted reconsideration under the statute of limitations because that was the only argument raised by the PUD in its motion for reconsideration. The judge specifically limited the order to Parcel 2 because the PUD did not argue Parcel 1 in its motion for reconsideration.

62

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

On appeal, the Maslonkas do not assign error to the order on reconsideration and did not raise the order in their opening brief. The PUD claims that review of the issue is barred and that dismissal of the negligence claim as to Parcel 2 must be affirmed. The PUD is correct. While the Maslonkas included a copy of the order in their notice of appeal, they did not include it in their assignments of error and did not argue it in their opening brief.

This court typically does not review issues that fail to meet the briefing requirements of RAP 10.3(a)(4), (6). *E.g. Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998) ("Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration."). While the Maslonkas argue the issue in their reply brief, such argument is too late to merit review. "[A] contention presented for the first time in the reply brief will not receive consideration on appeal." *Fosbre v. State*, 70 Wn.2d 578, 583, 424 P.2d 901 (1967).

F. CONCLUSION

The superior court dismissed all of the Maslonkas' claims against the PUD on summary judgment. We affirm dismissal of all claims related to Parcel 1 for failure to raise a genuine issue of material fact. We also affirm summary judgment dismissal of the negligence claim for Parcel 2 because the Maslonkas did not assign error to that order.

No. 37747-4-III
*Maslonka, et al v. PUD No. 1, et al*

We reverse dismissal of the claims for inverse condemnation, trespass, and nuisance as to

Parcel 2, and remand for further proceedings.

_____
Staab, J.

WE CONCUR:

_____
Fearing, J.

_____
Lawrence-Berrey, A.C.J.

64